DECISION AND JUDGMENT ENTRY
{¶ 1} Plaintiff-appellant, Gerald Miller, Administrator of the Estate of Nikki A. Miller, appeals a jury verdict in favor of defendants-appellees, Joseph S. Yazdi, M.D. and The Toledo Clinic, Inc. *Page 2 
 {¶ 2} On July 7, 2002, Nikki Miller began experiencing numbness in her right arm, neck, and face. Appellant, Nikki's husband, drove her to the Defiance Regional Medical Center ("Defiance Hospital"), where she was examined and told to visit her primary care physician if her symptoms persisted. The next day Nikki still had the tingling in her arm and transient mild paralysis on the right side of her face; therefore, she called the Urgent Care Center at the Defiance Clinic. Her regular physician was not in that day, but Nikki was examined by one of the other doctors, specifically, Thomas A. Losey, M.D.
 {¶ 3} After examining Nikki, Dr. Losey believed that her physical difficulties might indicate a condition called transient Bell's Palsy, but that the most likely cause was a "right cervical nerve root compression or carpal tunnel." The physician was also aware, however, that Nikki's condition could be caused by mini-strokes known as Transient Ischemic Attacks or by a brain tumor. Dr. Losey gave Nikki an order for a Computed Axial Tomography ("CAT") scan of her head to be taken the next day, July 9, 2002, in the radiology department of the Defiance Clinic.
 {¶ 4} When appellant and Nikki arrived at the clinic the next day, they were told that Dr. Losey wanted the radiologist to perform a Magnetic Resonance Imaging ("MRI") scan rather than a CAT scan. Because the clinic did not have a permanent MRI scanner, Nikki's appointment was changed to July 12, 2002, the day the "traveling" MRI scanner would be present at the clinic. On that date, the MRI revealed that Nikki may have suffered a stroke. Her husband was called and told to take her immediately to the *Page 3 
Medical College of Ohio Hospital. Nikki's medical insurance, however, did not cover this facility. Because Dr. Losey could not be reached, Nikki went to the emergency room at Defiance Hospital where it was arranged for her to see appellee, Dr. Yazdi, a neurosurgeon whose practice is associated with appellee, the Toledo Clinic, Inc.
 {¶ 5} After examining Nikki's MRI and taking a history, Dr. Yazdi made a differential diagnosis of either a stroke or a brain tumor, but he believed that a brain tumor was the more likely cause of his patient's condition. Because of this diagnosis, Dr. Yazdi did not refer Nikki to a neurologist for further examination and possible treatment. Instead, in order to determine an exact diagnosis, Dr. Yazdi scheduled Nikki for a biopsy and resection of the brain for Monday, July 15, 2002. Nikki remained in Toledo Hospital over the weekend and received treatment, in particular, steroids to reduce swelling in the brain and anti-seizure medication. She was not treated with an anticoagulent. Her condition continued to deteriorate.
 {¶ 6} On Monday, July 15, 2002, Dr. Yazdi performed a craniotomy and discovered an area of the brain that lacked any blood flow, but had no visible tumors. At trial, Dr. Yazdi testified that this did not mean that there was no tumor. Therefore, he took three small samples of brain tissue for diagnostic testing. The pathologist reported that testing of the brain cells indicated that there was no tumor and that Nikki had suffered a stroke. At that point, Dr. Yazdi ordered an angiogram and a neurological consultation, but noted that the neurologist(s) could not have treated Nikki in any manner *Page 4 
different than he had been treating her because the affected area was "too big" and it was "too late." Nikki became comatose on July 16, 2002 and died on July 18, 2002.
 {¶ 7} On July 3, 2003, appellant filed the instant wrongful death action in which he asserted that Nikki's death was caused by the negligence/medical malpractice of a number of defendants, including appellees, Dr. Yazdi and the Toledo Clinic, Inc. The defendants answered, and the case proceeded to a jury trial. Appellant, prior to the commencement of trial, dismissed, without prejudice, his case against some of the defendants, e.g., Defiance Regional Medical Center and Emergency Physicians of Northwest Ohio. Other defendants were eventually dismissed with prejudice, leaving only appellees as the two remaining defendants. The jury returned a verdict in favor of appellees. Appellant timely appeals that judgment and sets forth the following assignments of error:
 {¶ 8} "I. The court erred as a matter of law in permitting the use of a learned treatise for a purpose other than impeachment of an expert witness."
 {¶ 9} "II. The court erred as a matter of law in permitting testimony that compared the use of heparin in this case with the results of heparin use in Ariel Sharon."
 {¶ 10} "III. The court erred as a matter of law in instructing the jury on various matters."
 {¶ 11} This appeal involves a wrongful death action based upon the negligence, i.e., medical malpractice, of Dr. Yazdi in treating the decedent, Nikki Miller. Thus, the applicable law is as follows. *Page 5 
 {¶ 12} To establish a claim of medical malpractice, a plaintiff must satisfy, by a preponderance of the evidence, four elements, to wit: (1) the physician owed a duty to the injured party (2) the physician breached this duty; (3) a demonstration of the probability that the breach was a proximate cause of the harm to the plaintiff; and (4) damages. Trevena v. Primehealth, Inc., 171 Ohio App.3d 501,2006-Ohio-6535, ¶ 52 (Citation omitted.). See, also, Berdyck v.Shinde (1993), 66 Ohio St.3d 573, 579. Proof of the recognized standard of care in the medical community must be established by expert testimony. Bruni v. Tatsumi, 66 Ohio St.3d 127, 131-132. A physician's conformity with or departure from the recognized standard of care is ordinarily determined from expert medical testimony. Id. at 131-132. Testimony with respect to proximate cause must be stated in terms of probability. Stinson v. England (1994), 69 Ohio St.3d 451, paragraph one of the syllabus.
 {¶ 13} In his Assignment of Error No. I, appellant urges that the trial court erred by allowing appellees to use, during Dr. Yazdi's redirect examination, a learned treatise to demonstrate the truth of the matter asserted. Appellant had already used the treatise in his cross-examination of Dr. Yazdi in order to impeach the doctor's testimony with regard to his insistence that the use of heparin, an anticoagulant, was "contradictory" to the treatment needed by Nikki on July 12, 2002. In other words, the doctor claimed that due to his primary diagnosis of a brain tumor, prescribing heparin would result in administering the improper treatment of Nikki's condition. *Page 6 
 {¶ 14} On redirect, and over appellant's objection, one of appellees' attorneys, John F. Brodie, Jr., was permitted to use the treatise to elicit testimony from Dr. Yazdi to the effect that in a case where someone has had a "huge stroke" five days earlier, there is no literature supporting the use of heparin. Brodie also had Dr. Yazdi read out loud certain sections of the treatise. One section declared, "There is no convincing evidence that anticoagulants are effective for any particular stroke subtype." A second section read by the doctor concluded: "Therefore, use of subcutaneous unfractionated Heparin is not recommended for decreasing the risk of death or stroke-related morbidity or for preventing early stroke recurrence."
 {¶ 15} At the time of the trial of this cause, Evid.R. 706 treated the information in a learned treatise as hearsay and, as a result, permitted the use of the same only upon cross-examination and only for the purpose of impeaching an expert witness. Scibelli v. Pannunzio, 7th Dist. No. 05MA150, 2006-Ohio-5652, ¶ 61. Thus, under the former evidentiary rule, learned treatises could not be used as substantive evidence. SeeMack v. Krebs, 9th Dist. No. 02CA008203, 2003-Ohio-5359, ¶ 20. Consequently, appellees could not use the treatise as evidence showing that Dr. Yazdi had not departed from the standard of care used by a neurosurgeon in treating a patient who had a stroke.
 {¶ 16} Appellees claim, however, that the use of the treatise was harmless error due to the fact that on July 1, 2006, Evid.R. 706 was repealed and Evid.R. 803 was amended to create an exception to the hearsay rule for, among other things, a learned treatise. See Evid.R. 1102(N) and Evid.R. 803(18). Appellees, therefore, argue that in *Page 7 
the event that we reverse the trial court's judgment and remand this cause for a new trial, Evid.R. 803(18) would allow them to use a learned treatise for the truth of the matter asserted; that is, that Dr. Yazdi was not negligent in his diagnosis and resulting medical treatment of Nikki. Appellant contends, nonetheless, that the use of the treatise was prejudicial error because he was unable to prepare an adequate counter argument, but would be able to do so if this cause is remanded for a new trial. We find that the use of the treatise on redirect examination of Dr. Yazdi was harmless error, albeit for a different reason.
 {¶ 17} We start with the proposition that the admission or exclusion of evidence is a matter solely within the discretion of a trial court, and a reviewing court may reverse a court's decision on this issue only upon a showing of an abuse of that discretion. Krischbaum v. Dillon
(1991), 58 Ohio St.3d 58, 66. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 18} Civ.R. 61 provides:
 {¶ 19} "No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the *Page 8 
proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."
 {¶ 20} In determining whether the error in this instance was harmless, we must not only weigh the prejudicial effect of the error but also determine whether, if that error had not occurred, the jury would probably have made the same decision. O'Brien v. Angley (1980),63 Ohio St.2d 159, 164 (Citations omitted.).
 {¶ 21} Appellant asserted that Dr. Yazdi failed to recognize that Nikki had suffered a stroke, did not properly treat her for a stroke because he failed to prescribe the administration of an anticoagulent, such as heparin, and exacerbated her condition by performing a craniotomy. Appellant relied on the expert testimony of physicians to support his assertions. In essence, appellant maintained that Dr. Yazdi was negligent (departed from the standard of care) because he misdiagnosed Nikki's condition and performed a craniotomy, that is, provided a treatment, that caused her death.
 {¶ 22} Gary C. Dennis, M.D., a neurosurgeon, was an expert witness for appellant. He testified that he reviewed all of Nikki's hospital records, the results of the tests performed (MRI and CAT scans), the doctors' reports, and the depositions of all of the experts involved in this case. Initially, Dr. Dennis testified that based upon his review, Nikki was having a stroke on July 12, 2002. Therefore, he would have referred Nikki to a neurologist because their primary function is to detect and treat strokes. While acknowledging that Nikki's physical condition could be caused by a tumor, the doctor stated that the scans showed a "diminished blood flow in the main artery that goes to the *Page 9 
left side of the brain." Dr. Dennis believed that the decreased blood flow in combination with the "brain mass in the distribution of that artery" indicated that Nikki was having a stroke. Nevertheless, at that time, there was no pressure on her brain stem, which controls automatic processes, such as breathing, in humans. The doctor testified, to a medical probability, that, as of July 12, 2002, Nikki's condition was treatable and that proper treatment would have prevented that condition from becoming worse.
 {¶ 23} Dr. Dennis then discussed his findings based upon the review of a "stealth MRI" performed on July 15, 2002, shortly before Nikki's brain biopsy. According to the doctor, the blood flow on the left side of Nikki's brain was completely gone, there was some pressure on the brain, but not on the brain stem, and the stroke was getting "bigger." Upon reviewing a CAT scan performed on July 16, 2002, the doctor noted that the craniotomy caused "massive swelling in the stroke" which compressed the brain stem and was the cause of Nikki's death. Dr. Dennis was of the opinion that Dr. Yazdi departed from the medical standard of care because he failed to diagnose Nikki's condition as a stroke, failed to timely provide the proper treatment by prescribing heparin to prevent clotting in the affected artery, by performing a craniotomy that caused the brain to swell, and by failing to properly treat his patient after the surgery. He testified, to a reasonable degree of medical probability, that with the proper treatment, Nikki would have survived.
 {¶ 24} Appellant also presented Lawrence Cooperstein, M.D., a diagnostic radiologist, as an expert witness. Dr. Cooperstein also discussed the scans of Nikki's *Page 10 
brain, beginning with the July 12, 2002 MRI. He explained that this scan showed that the carotid artery on the left side of Nikki's brain and a whitish-gray area on the left side of her brain indicated that she had/was having an acute stroke and that it would be unreasonable for any radiologist reviewing the MRI to diagnose Nikki's condition as a brain tumor. Viewing the July 15, 2002 MRI, Dr. Cooperstein saw no clinically significant change in Nikki's brain. However, he testified that the scans performed after the craniotomy showed swelling caused by the surgery and pressure on the brain stem. In Dr Cooperstein's opinion, to a reasonable degree of medical probability, the cause of Nikki's death was the swelling of her brain (which caused the brain to push down on the brain stem, thereby stopping her breathing) as the result of the craniotomy.
 {¶ 25} Appellant's third expert witness[1], Lenny Jay Turkewitz, M.D., a neurologist, opined, to a reasonable degree of medical probability, that Nikki would have survived her stroke(s) if she had never been treated by Dr. Yazdi. Dr. Turkewitz testified that Nikki's death was the result of the craniotomy. He further averred that Dr. Yazdi should not have assumed that Nikki's condition was caused by a tumor, that he should not have operated on an ischemic stroke, and that this surgery "directly led to this woman's death." Dr. Turkewitz would have, inter alia, ordered heparin, bed rest with Nikki's head at a thirty degree angle, no food until a swallowing study was done, "making sure her blood sugar never went above 140, close nursing observation, and keeping her hydrated." With this, the best medical therapy that was available in 2002, Dr. Turkewitz was, to a *Page 11 
reasonable degree of medical probability, of the opinion that Nikki would have survived with no physical deficit to a modest physical deficit.
 {¶ 26} As stated previously, the crux of appellant's case was Dr. Yazdi's alleged misdiagnosis and lack of treatment of the actual cause, a stroke, of Nikki's physical condition that led to her death. Appellant put forth ample testimony, as set forth above, from expert witnesses supporting this theory for recovery. Appellees, however, also presented expert testimony contrary to that offered by appellant.
 {¶ 27} Michael J. Potchen, M.D., a radiologist, opined, to a reasonable degree of medical probability, that it would be reasonable for a physician to include a tumor in a differential diagnosis in a case such as this one. The defense further offered the expert testimony of Amin B. Kassam, M.D., a neurosurgeon specializing in "blood vessel problems that deal with the brain," to the effect that the stroke and the swelling of Nikki's brain, which was caused by the original stroke, would have continued until she died. Dr. Kassam further stated, to a reasonable degree of medical probability, that the biopsy/craniotomy did not affect the outcome of this case, specifically, Nikki's demise.
 {¶ 28} In addition, Jerry G. Kaplan, M.D., a neurologist, testified that as of July 12, 2002, Nikki had a huge insult or lesion that was caused by a stroke. Dr. Kaplan maintained that the lesion involved "almost the entire left hemisphere" of Nikki's brain and was causing swelling that pushed the brain into the right hemisphere and down on the brain stem. He opined, to a reasonable degree of medical probability, that heparin had no place or very little place in an acute stroke because "there's so much infarcted tissue, *Page 12 
there's so much of a tendency to bleed, and the damage has already been done." Dr. Kaplan also testified, to a reasonable degree of medical certainty, that the biopsy did not contribute to Nikki's death because the brain was already "damaged very gravely three days before the biopsy and the biopsy didn't produce any worsening or any new lesions." Finally, the doctor testified, to a reasonable degree of medical probability, that the prognosis in this case was "horrendous," specifically, that the swelling of Nikki's brain cells "continued their course of death."
 {¶ 29} Based upon the foregoing, we conclude that even though appellees employed a learned treatise on redirect examination of Dr. Yazdi to discuss the use of heparin, it had no effect on the outcome of this action. In particular, the jury obviously heard all of the foregoing testimony and determined, based upon the credibility of the witnesses[2], that: (1) Dr. Yazdi's differential diagnosis of a tumor or a stroke and the craniotomy/biopsy he performed were not a departure from the standard of care in the medical community, and/or (2) Dr. Yazdi's diagnosis was not the proximate cause of Nikki's death; and/or (3) due to the gravity of Nikki's stroke, treatment by means of heparin would be futile. Therefore, the utilization of the treatise was harmless error, and the trial court did not abuse its discretion in overruling appellant's objection.
 {¶ 30} We further note that at least one other appellate court has allowed the use of a learned treatise on redirect examination in a case where use of unfavorable portions of a treatise is used to impeach the credibility of an expert witness on cross-examination. See *Page 13 Hinkle v. Cleveland Clinic Foundation, 159 Ohio App.3d 351,2004-Ohio-6853, ¶ 39. In Hinkle, the Eighth Appellate District based this holding on the fundamental fairness in permitting a party to rehabilitate his witness using other sections of the same treatise. Id. ¶ 39. This is exactly what occurred in the case before us. Appellant used portions of a treatise to impeach Dr. Yazdi on the use of antithrombotic drugs to treat stroke patients and the right of a patient to choose the use of heparin to treat a stroke. On redirect, appellees' attorney used portions of this same treatise to rehabilitate the witness, Dr. Yazdi, on these same issues by putting them in the context that they were made. Accordingly, pursuant to Hinkle, we conclude that the trial court did not abuse its discretion in permitting the use of the learned treaty on redirect examination.
 {¶ 31} Appellant's assignment of Error No. I is found not well-taken.
 {¶ 32} In his Assignment of Error No. II, appellant contends that the trial court erred as a matter of law by allowing testimony that compared the consequences that occurred when heparin was used in the treatment provided to the Israeli Prime Minister, Ariel Sharon, to the possible consequences of its use in the treatment of Nikki Miller. At the trial of this matter, Dr. Kassam, on direct examination, testified that he would be "deeply concerned" about employing anticoagulents, such as heparin, in treating Nikki's acute type of stroke because it would not have any salutorious effect, but did have the potential to aggravate Nikki's "dead brain" by causing bleeding.
 {¶ 33} On cross-examination, one of appellant's attorneys had Dr. Kassam read sections from the website of the University of Pittsburgh Medical Center. Those sections *Page 14 
stated that medical treatment for a stroke may include heparin, that heparin helps a blood clot from becoming larger and prevents new clots, and that three million people live with the effects of a stroke and thousands more continue to enjoy life despite neurological conditions. Dr. Kassam, who is employed by the University of Pittsburgh, then testified that the statements posted on the website were made out of context and were applicable only to specific types of strokes.
 {¶ 34} On redirect examination, Dr. Kassam indicated that heparin is "like any other tool" that a physician has in treating a stroke and, in essence, its use in a particular case must be decided by the treating physician in that particular context. Dr. Kassam testified, without objection, that the administration of heparin in the instant case "would have most certainly done more harm." At that point, appellees' counsel asked Dr. Kassam: "Doctor, are there any, I guess, examples by way of world leaders harmed with [h]eparin or anti-coagulants?" Appellant objected on the basis that the question was "totally improper, saying, "How am I expected to cross-examine what he is going to say?" Appellees' counsel argued that appellant was the one who raised the issue by suggesting that a stroke like Nikki's "could be managed and everything else." The trial court agreed and overruled the objection, finding that appellant had "opened the door" on this subject.
 {¶ 35} Dr. Kassam then provided the following brief description of what happened when Prime Minister Sharon was treated with "blood thinners" after having a stroke: *Page 15 
 {¶ 36} "He [Sharon] had terrific hemorrhages related to that that further required surgery on more than one occasion and he was — his injuries were certainly not helped by the administration of [h]eparin in that setting, and, unfortunately [sic] it's a poignant example."
 {¶ 37} Assuming, arguendo, that the trial court erred in allowing the above testimony, we must agree that the same was invited error. Pursuant to the invited error doctrine, a party may not take advantage of an alleged error that the party induced or invited the trial court to make.State ex rel. The V. Cos. v. Marshall, 81 Ohio St.3d 467, 471,1998-Ohio-329; State v. Woodruff (1983), 10 Ohio App.3d 326, 327. Invited error occurs when trial counsel is "actively responsible" for the trial court's error. State v. Campbell, 90 Ohio St.3d 320, 324,2000-Ohio-183.
 {¶ 38} As applied to the present case, on cross-examination, appellant's attorney attempted to impeach Dr. Kassam's testimony by having him read blanket statements from a website that might indicate the efficacy of heparin in all cases involving a stroke. On redirect, appellees' attorney then asked his witness questions that allowed Dr. Kassam to put the statements made in the University of Pittsburgh website in to the context of treating individual patients, including Prime Minister Sharon and Nikki Miller, who have had or are having a stroke. Clearly, appellant was actively responsible for the elicitation of Dr. Kassam's disputed testimony on redirect examination. We therefore conclude that error, if any, made by the trial court in allowing testimony related to Prime Minister Sharon was invited error. Appellant's Assignment of Error No. II is found not well-taken. *Page 16 
 {¶ 39} We now turn to appellant's Assignment of Error No. III, in which he claims that the trial court erred, over his objections, by giving "different methods," "bad result," "no guarantee," and "foreseeability" instructions to the jury.
 {¶ 40} Requested jury instructions should ordinarily be given if they are correct statements of law that are applicable to the facts in the case, and reasonable minds might reach the conclusion sought by the instruction. Murphy v. Carrollton Mfg. Co. (1991), 61 Ohio St.3d 585,591. Generally, a trial court's decision regarding whether the evidence produced at trial warrants a particular jury instruction is reviewed for an abuse of discretion. Chambers v. Admr., Ohio Bur. of Workers'Comp., 164 Ohio App.3d 397, 2005-Ohio-6086, ¶ 6. To repeat, an abuse of discretion connotes more than an error of law or judgment; rather, it implies that the trial court's attitude in reaching its decision was arbitrary, unreasonable, or unconscionable. Blakemore v. Blakemore,5 Ohio St.3d at 219. Moreover, it is this court's task to review the jury instructions as a whole and to determine whether or not the instructions "probably misled the jury in a matter materially affecting the complaining party's substantial rights." Becker v. Lake Cty. Mem.Hosp. West (1990), 53 Ohio St.3d 202, 208 (Citation omitted.).
 {¶ 41} Appellant first contends that the trial court abused its discretion by, over his objection, including a "different methods" instruction to the jury. He maintains that the "different methods" instruction should not have been given in this case because Dr. Yazdi incorrectly diagnosed Nikki Miller's stroke as a brain tumor, and, as a consequence, she never received any stroke specific treatment. *Page 17 
 {¶ 42} The following "different methods" instruction[3] was provided to the jury:
"Now, although some other physician might have used a method of treatment or procedure different from that used by the defendant, this circumstance by itself, without more, does not prove that the defendant was negligent. You are to decide whether the treatment used by the defendant was reasonably careful and in accordance with the standard of care required of a physician in his or her field of practice.
 {¶ 43} "The customary or routine method of treatment may be considered by you along with all other facts and circumstances in evidence.
 {¶ 44} "Although a particular method may be customary, usual, or routine, this circumstance will not of itself, without more, prove that method to be careful. You are to decide whether the method of treatment used by the defendant was reasonably careful and in accordance with the standard of care required by a physician in his or her field of practice."
 {¶ 45} In a medical malpractice case, a "different methods" jury instruction is appropriate only in a case where there is evidence offered showing that "more than one method of diagnosis or treatment is acceptable for a particular medical condition." Pesek v. UniversityNeurologists Assn., Inc., 87 Ohio St.3d 495, 498, 2000-Ohio-483. In other *Page 18 
words, to give the instruction, there must be evidence supporting the existence of an acceptable alternative method for the treatment of a particular medical condition. Id. at 498-499.
 {¶ 46} Initially, we find that Dr. Yazdi did not immediately diagnose the cause of Nikki's condition as a brain tumor. He diagnosed the cause of her condition as either a tumor or a stoke, with a tumor being the most likely cause. In his testimony, Dr. Yazdi further stated that even if he would have considered the stroke as the most likely cause, he would have still performed a biopsy of Nikki's brain in order to reach a definitive diagnosis. There was testimony offered at trial to show that other experts believed that this method of treatment was improper and, in actuality, was the cause of Nikki's death.
 {¶ 47} Furthermore, there was testimony on both sides that indicated other different methods of treatment at that point in time. Some of appellant's experts insisted that Dr. Yazdi deviated from the standard of care because he failed to immediately prescribe anticoagulants, such as heparin and/or anti-platelets in treating Nikki. To the contrary, Dr. Yazdi's experts testified that their use would do more harm than good or that such treatment would be futile due to the gravity of Nikki's condition at the time that Dr. Yazdi first saw her. Dr. Yazdi insisted that he did treat Nikki, who had a "large, large lesion" that was "five days old minimum," for stroke by keeping her in the hospital for observation, managing her blood pressure and her blood sugar, and keeping her hydrated. Based upon the foregoing, we find that there were alternative methods treatment for *Page 19 
stroke offered at trial; therefore, the trial court did not abuse its discretion in giving the "alternate methods" instruction to the jury.
 {¶ 48} Appellant next argues that the trial court should not have given both the "bad result" and "guarantee" instructions because they arise from the same Ohio jury instruction section. He complains that the repetition of instructions on the same matter "heavily weighted this instruction" as opposed to other instructions that were only given once.
 {¶ 49} The "bad result" instruction given by the trial court is patterned after the instruction found in 3 Ohio Jury Instructions Section 331.01(6), and reads: "The fact that the doctor's treatment did not bring about a cure, or fulfill the patient's expectations, does not, by itself prove that the doctor was negligent." The court's instruction on "guarantee" is in a different section and provides:
 {¶ 50} "A physician does not guarantee that his care and treatment of a patient will always be successful, nor does a physician promise that nothing serious will result thereof. Rather, his duty is to exercise that degree of care, skill, and diligence which is ordinarily employed by members of a medical profession in that same specialty."
 {¶ 51} In Callahan v. Akron General Med. Ctr., 9th Dist. No.2005-Ohio-5103, ¶ 12, the plaintiffs-appellants contended, in essence, that the giving of both a "bad result" instruction and a "guarantee" was simply the repetition of the instruction set forth in 3 Ohio Jury Instructions Section 331.01(6) and, therefore, suggested "to the jury the court's bias against Appellants' claim." The Callahan court disagreed, finding that upon *Page 20 
reviewing the court's instructions as a whole, they were "fairly balanced" and included "accurate statements of the law." Id. As inCallahan, appellant's heavily weighted argument implies bias on the part of the common pleas court, and, as in Callahan, this court has reviewed the jury instructions as a whole and finds that they are both fair and accurate. Accordingly, the trial court's attitude in giving both of these instructions was not unreasonable, arbitrary, or unconscionable.
 {¶ 52} As to the "foreseeability" instruction, appellant failed to raise any reason in the court below for the exclusion of this instruction. On appeal, he simply argues that this instruction was "misleading." Our reading of the court's instruction on foreseeability reveals that it is patterned, almost word for word, on the language set forth in 1 Ohio Jury Instructions Sections 1.99 and 7.13. Therefore, we find that the common pleas court did not abuse its discretion in giving this particular foreseeability instruction. For the foregoing reasons, appellant's Assignment of Error No. III is found not well-taken.
 {¶ 53} On consideration whereof, this court finds that substantial justice was done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED. *Page 21 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., Arlene Singer, J., CONCUR.
[1] Dr. Turkewitz `s deposition was read into the record at trial.
[2] Evaluation of witness credibility rests almost exclusively in the trier of fact Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80.
[3] The relevant portion of 3 Ohio Jury Instructions Section 331.01
reads:
"(4) DIFFERENT METHODS (OPTIONAL) Although some other (physician) (surgeon) might have used a method of (diagnosis) (treatment) (procedure) different from that used by the defendant, this circumstance will not by itself prove that the defendant was negligent. You shall decide whether the (diagnosis) (treatment) (procedure) used by the defendant was in accordance with the required standard of care." *Page 1