[Cite as *In re I.P.*, 2015-Ohio-4061.]

IN THE COURT OF APP OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re I.P.

Court of Appeals No. L-15-1136

Trial Court No. JC 14238542

**DECISION AND JUDGMENT**

Decided: September 30, 2015

* * * * *

Adam H. Houser, for appellant.

Jeremy G. Young, for appellee.

* * * * *

**JENSEN, J.**

{¶ 1} Appellant, B.P., appeals the April 29, 2015 judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated her parental rights and awarded permanent custody of her son to Lucas County Children Services ("LCCS"). For the reasons that follow, we affirm the trial court's judgment.

## I. BACKGROUND

### A. The LCCS Referral

{¶ 2} B.P. is the mother of I.P., who was born in April of 2011.[1]  On February 20, 2014, it was reported to LCCS that I.P. had numerous bruises on his bottom and upper thighs from being spanked by his mother and her boyfriend.  B.P. acknowledged to an LCCS caseworker that her boyfriend spanked I.P., leaving the black-and-blue marks, after I.P. broke their DVD player.  LCCS obtained an ex parte order for shelter care on February 21, 2014, and I.P. was removed from the home.

{¶ 3} On February 24, 2014, LCCS filed a complaint in dependency, neglect, and abuse and a motion for shelter care hearing.  Following a hearing that same day, LCCS was awarded temporary custody of I.P.  The court appointed attorney Steven Casiere to serve as counsel and guardian ad litem ("GAL") for I.P.  On March 24, 2014, the magistrate determined I.P. to be dependent, neglected, and abused, and ordered that temporary custody remain with LCCS.  LCCS filed a case plan that day.  The trial court approved the magistrate's decision on April 23, 2014, and it approved the case plan on May 23, 2014.

### B. The Case Plan

{¶ 4} B.P. admitted to using heroin and abusing alcohol.  She reported to LCCS that she suffers from bi-polar disorder and post-traumatic stress disorder, but was not

---

[1] J.D. is I.P.'s father.  His parental rights were also terminated by the trial court's April 29, 2015 judgment, but he did not appeal the decision.  We address the underlying proceedings only with respect to B.P.'s interests.

2.

currently medicated. In addition to these substance abuse and mental health issues, B.P. was arrested for domestic abuse on February 23, 2014, and at the time of her arrest, she had an outstanding warrant on a disorderly conduct charge from 2013. While at the Lucas County Corrections Center ("LCCC") on these charges, she was charged with felony assault for throwing a book at a corrections officer.

{¶ 5} The aim of the case plan was for B.P. to remain drug and alcohol free, to learn to resolve conflict without resorting to violence, to learn safe and appropriate methods of disciplining her child, to respond appropriately to situations that cause her to become upset, to develop safe and healthy relationships, and to obtain safe, stable, and appropriate housing. To achieve these goals, B.P. was required to participate in substance abuse and mental health diagnostics, as well as any recommended treatment; participate in the Lucas County Family Drug Court program; undergo assessment for domestic violence services and follow all recommendations; participate in a parenting program; undergo assessment for anger management services and participate in further services if recommended; and participate in services through the Women's Empowerment Services Team ("WEST"). The domestic violence, parenting, and anger management services were to begin after B.P. maintained several weeks of sobriety and had a sober support system in place. The plan provided for weekly supervised visits with I.P. The goal of the case plan was reunification.

3.

## C.  B.P.'s Efforts to Complete the Case Plan

{¶ 6} B.P. remained at LCCC until March 24, 2014.  Beginning in April of 2014, after she was released, she began appearing in drug court.  During April and May of 2014, she continued to test positive for alcohol to the point that the court required her to wear a monitor.  Nevertheless, she completed Unison's intensive outpatient program ("IOP") and began aftercare in July of 2014.  IOP consisted of treatment three times a week, three hours at a time, for 18 sessions.  B.P. also began attending WEST meetings.

{¶ 7} The drug court ordered B.P. to reside at the Sparrow's Nest, which also provides treatment for women in recovery.  Three times she moved into Sparrow's Nest and three times she left without completing treatment.  The drug court ultimately ordered B.P. to spend a night in jail for violating its orders.  In August of 2014, it ordered B.P. into female transitional housing at the Naomi House, which also provides treatment.  For a time, B.P. was demonstrating progress, however, she was discharged from the Naomi House in October of 2014 for rules violations.  She did not complete the program.  Because B.P. continued to exhibit behaviors consistent with addiction, LCCS did not make the referrals for the additional programs that B.P. was required to complete as part of the case plan.

{¶ 8} In November, B.P. went to trial on the felony assault charge from the February 2014 incident involving the corrections officer.  A jury convicted her.  The common pleas court sentenced her to probation.  In connection with her probation, she was required to be assessed by Court Diagnostic and Treatment Center ("CDTC").

4.

CDTC performed assessments on December 2 and 23, 2014. It recommended a dual diagnostic program to address her mental health and substance abuse issues, as well as anger management treatment. B.P. opted to undergo both programs simultaneously. Both required attendance at one 90-minute session per week—one for each program. Successful completion takes three months. Participants can miss two classes. The first available program began February 11, 2015. As of February 27, 2015, B.P. had missed one class in each of the programs. CDTC also scheduled B.P. for a psychological evaluation to take place in March of 2015. It would be determined at that time whether there were medications that B.P. should consider taking.

{¶ 9} During her treatment with CDTC, she could not proceed with services through Unison. She did not complete Unison's aftercare program. She never advanced beyond the second of three phases in drug court. And because she had not demonstrated sobriety for a sufficient period of time, she was not able to begin domestic violence treatment, the parenting program, or the anger management services required by the case plan. She did, however, consistently attend AA meetings and was pursuing plans to start her own heroin anonymous group. She provided 29 negative urine screens out of 30 for the period of October 1, 2014 to February 6, 2015.

{¶ 10} In February of 2015, B.P. missed a meeting with LCCS, allegedly due to bad roads, and she missed a urine drop. She also missed a 1:00 appointment with her drug court team in February, allegedly because she overslept.

5.

{¶ 11} In the year following I.P.'s removal from the home, B.P. did not secure permanent housing. She lived at her boyfriend's apartment, then the Lucas County Corrections Center, her mother's house, Sparrow's Nest, the Davis Building, where she worked and rented space, Sparrow's Nest again, Naomi House, Sparrow's Nest a third time, then her mother's house again. LCCS, concerned about B.P. living with her mother, who is an alcoholic, suggested that she pursue housing arrangements with Harbor House. B.P. did not do this.

### D. I.P.'s Placement

{¶ 12} After I.P.'s removal from B.P.'s custody, he was placed with foster parents. In October of 2014, he was placed with his paternal uncle and aunt. It was reported that he was doing well in their care and they expressed an interest in adopting him.

{¶ 13} For the most part, B.P. visited with I.P. as scheduled, but she missed two visits in February of 2015 due to bad roads and lack of transportation. B.P. worked with a visit coach, however, who observed her visits with I.P. and made suggestions to optimize those visits. After four visits, the coach determined B.P.'s interaction with I.P to be appropriate and closed her file.

{¶ 14} I.P.'s GAL observed that B.P. and I.P. have a very strong bond and that I.P. has expressed his love for his mother. Nevertheless, he recommended that LCCS be granted permanent custody due to B.P.'s lack of progress throughout the case plan and I.P.'s happiness in his current living arrangement. He also opined that while I.P. is very

6.

smart for his age, he is not mature enough to state his wishes; having said that, the GAL relayed that I.P. has indicated a desire to remain with his aunt and uncle.

### E. LCCS's Motion for Permanent Custody

{¶ 15} On November 25, 2014, LCCS moved for permanent custody and for an order permanently terminating parental rights. The matter was heard by the trial court on February 27, 2015. The court heard testimony from Darren Love, a treatment program manager at CDTC; Deborah Wedding, the family caseworker from LCCS who was assigned to the case; B.P.; Leverine Graham, a visit coach caseworker from LCCS; Danelle Williams, one of B.P.'s sober supports whom she met during AA; and Steven Casiere, I.P.'s attorney and GAL.

{¶ 16} The trial court granted LCCS's motion on April 29, 2015. Pursuant to R.C. 2151.414(B)(1)(a), it found by clear and convincing evidence that I.P. was not abandoned or orphaned, has not been in the custody of a public children's services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent. It also found, under R.C. 2151.414(E)(1), (2), and (4) that B.P. had failed continuously and repeatedly to substantially remedy the conditions causing I.P. to be removed from the home, that B.P.'s chronic mental illness and chemical dependency are so severe that they render her unable to provide an adequate permanent home for I.P. at the present time or within the next year, and that B.P. has demonstrated a lack of commitment toward I.P by failing to provide an adequate permanent home, by missing

7.

visits and meetings, and by failing to follow through with treatment programs. Finally, it found that a permanent grant of custody to LCCS is in I.P.'s best interest taking into consideration the factors set forth in R.C. 2151.414(D)(1)(a) through (e).

{¶ 17} B.P. appealed the trial court's decision and assigns the following errors for our review:

> 1. THE FINDING THAT THE CHILD COULD NOT BE PLACED WITH APPELLANT WITHIN A REASONABLE TIME WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

> 2. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT GRANTED PERMANENT CUSTODY TO THE AGENCY INSTEAD OF LEGAL CUSTODY TO THE PARTNEL [sic] AUNT AND UNCLE.

> 3. THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF EVIDENCE AS LUCAS COUNTY CHILDREN SERVICES DID NOT MAKE REASONABLE EFFORTS AND DILLIGENT [sic] EFFORTS TO REUNIFY THE FAMILY[.]

> 4. THE COURT ABUSED ITS DISCRETION WHEN IT ALLOWED THE LCCS CASEWORKER TO TESTIFY AS AN EXPERT TO THE MENTAL UNDERSTANDING OF THE DIFFERENCE BETWEEN BEING CLEAN AND BEING SOBER AND OVERRULED THE GUARDIAN AD LITEM'S OBJECTION AND VIOLATED MOTHER'S DUE PROCESS OF LAW.

8.

## II. LAW AND ANALYSIS

### A. First Assignment of Error

{¶ 18} In her first assignment of error, B.P. argues that the trial court's conclusion that I.P. could not be placed with her within a reasonable time was against the manifest weight of the evidence. She contends that she was making significant improvement in her case plan services and should have been granted more time to complete them.

{¶ 19} R.C. 2151.414 provides the analysis that a court must undertake when considering whether to terminate parental rights and vest permanent custody in a children's service agency. Under that provision, the court must first find that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(d) exists. Subsection (b) of that provision requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; and subsection (d) requires a finding that the child has been in the temporary custody of a public children's services agency or a private child placing agency for at least 12 months of a consecutive 22-month period. Subsection (a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children's services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re E.B.,* 12th Dist. Warren Nos. CA2009-10-139, CA2009-11-146, 2010-Ohio-1122, ¶ 14-15.

{¶ 20} If the court finds that R.C. 2151.414(B)(1)(b), (c), or (d) applies, it must next determine whether granting permanent custody to the agency is in the child's best interest. This requires the court to evaluate the factors enumerated in R.C. 2151.414(D)(1). *In re K.M.D.*, 4th Dist. Ross. No. 11CA3289, 2012-Ohio-755, ¶ 30. If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present which would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.,* 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 43. The court need not find that any of the R.C. 2151.414(E) factors are present if it relies on R.C. 2151.414(B)(1)(b)-(d) as the basis for granting permanent custody to LCCS.

{¶ 21} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *In re Tashayla S.,* 6th Dist. Lucas No. L–03–1253, 2004-Ohio-896, ¶ 14; *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Clear and convincing evidence is the highest level of evidentiary support necessary in a civil matter. *In re Stacey S.,* 136 Ohio App.3d 503, 520, 737 N.E.2d 92 (6th Dist.1999).

{¶ 22} The trial court found that R.C. 2151.414(B)(1)(a) applied, and undertook an analysis of whether any section (E) factor applied, indicating that I.P. cannot be placed

10.

with either parent within a reasonable time or should not be placed with either parent. It went on to determine whether under section (D)(1), granting permanent custody to ODJFS was in I.P.'s best interest.

{¶ 23} The trial court found that both R.C. 2151.414(E)(1), (2), and (4) applied. Those sections provide:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year

11.

after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

{¶ 24} With respect to R.C. 2151.414(E)(1), the trial court found that B.P. had changed residences nine times over the course of the case and, therefore, had not obtained safe, stable, and appropriate housing as required by the case plan. It also found that although B.P.'s early attendance and participation seemed to indicate a willingness to participate in the case plan services, her attendance was poor at the end of the program. She failed to complete aftercare services with Unison and was unable to complete the other programs required of her under the case plan. B.P. had remained in phase two of the family drug court program for the last six months, never progressing to the final phase. The trial court determined that these facts established that B.P. had been non-compliant with the case plan and that her non-compliance constituted grounds for terminating her parental rights.

{¶ 25} With respect to R.C. 2151.414(E)(2), the trial court found that the totality of the record reflected that B.P. had made minimal progress toward addressing the substance abuse and mental health issues with which she had been diagnosed. It found

12.

that there was no indication that B.P. could make the progress required of her within the next year to be successful in providing I.P. with a safe and stable environment.

{¶ 26} And with respect to R.C. 2151.414(E)(4), the trial court found that B.P. had demonstrated a lack of commitment toward I.P. by failing to follow through with her treatment options, failing to complete the treatment programs at either Sparrow's Nest or Naomi House, failing to complete the WEST or Hope for Families programs, oversleeping for a 1:00 appointment with her drug court team, missing two visits with I.P. in the month preceding the hearing, performing poorly in drug court which led to sanctions, and failing to demonstrate sober behavior.

{¶ 27} We find that there is clear and convincing evidence in the record to support all of these findings.

{¶ 28} B.P. argues, however, that she made significant progress and that LCCS should have requested an extension of time under R.C. 2151.415(D) to enable her to complete the case plan services. She contends that she has remained sober from October 1, 2014, through February 6, 2015, she attends AA meetings, she has a sponsor, she started her own group, and she has maintained her sobriety despite living with her mother. She claims that she could have successfully completed the dual diagnosis and anger management courses through CDTC within eight-to-nine weeks of the date of the permanent custody hearing and that she had a placement waiting for her at Harbor House which would provide a more sober living environment.

13.

{¶ 29} R.C. 2151.415(D) allows LCCS to request an extension of temporary custody for up to six months. To be granted an extension, LCCS must be able to show "by clear and convincing evidence, that the extension is in the best interest of the child, there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension." It is within the discretion of the trial court whether to grant or deny an extension of temporary custody. *In re H.G.,* 12th Dist. Clinton No. CA2014-11-014, 2015-Ohio-1764, ¶ 20.

{¶ 30} B.P. cites nothing suggesting that LCCS was in any way obligated to file such a motion. This is particularly true given LCCS's position that B.P. continued to demonstrate behaviors inconsistent with sobriety, she failed to make significant progress toward completing the programs identified in the case plan, she refused to contact Harbor House to arrange living arrangements before the hearing on LCCS's motion for permanent custody, and it was in I.P.'s best interest to be removed from the home.

{¶ 31} We find no error in the trial court's conclusions in support of its decision to terminate B.P.'s parental rights and to grant permanent custody to LCCS, and we find no error in the failure to grant B.P. an extension of time to allow her to continue with her case plan services.

{¶ 32} B.P.'s first assignment of error is not well-taken.

14.

## B. Second Assignment of Error

{¶ 33} In her second assignment of error, B.P. complains that the trial court abused its discretion when it granted permanent custody to LCCS instead of granting legal custody to I.P.'s paternal aunt and uncle. LCCS argues that B.P. lacks standing to raise this argument. We agree with LCCS.

{¶ 34} In *In re A.B.,* 6th Dist. Lucas Nos. L-12-1069, L-12-1081, 2012-Ohio-4632, ¶ 27–29 and *In re R.V.,* 6th Dist. Lucas Nos. L-10-1278, L-10-1301, 2011-Ohio-1837, ¶ 15, we recognized that parents lack standing to claim error in the trial court's failure to award custody of their children to particular third parties—in those cases to grandparents. We, therefore, find that B.P. lacks standing to raise this argument, and we find her second assignment of error not well-taken.

## C. Third Assignment of Error

{¶ 35} In her third assignment of error, B.P. claims that the court's decision terminating her parental rights and vesting permanent custody with LCCS was against the manifest weight of the evidence because LCCS did not make reasonable and diligent efforts to reunify the family. She claims that LCCS, the Lucas County Court of Common Pleas, and the Lucas County Drug Court ordered her into competing programs, none of which would allow her to engage in duplicative services simultaneously. She insists that this rendered her unable to complete the programs required of her in the LCCS case plan.

{¶ 36} In support of this assignment of error, B.P. explains that LCCS required her to participate in treatment through Unison. While she completed IOP there, she could not

15.

complete aftercare because she was ordered into the Naomi House by the Lucas County Drug Court. In addition to this, the Lucas County Court of Common Pleas ordered her to complete drug and alcohol and mental health treatment through CDTC. She was, therefore, required to start and restart drug and alcohol and mental health treatment through multiple service providers, thus preventing her from completing her case plan requirements. She argues that LCCS's duty to make reasonable and diligent efforts to unify the family obligated it to provide her with additional time to complete her services.

{¶ 37} The Ohio Supreme Court has recognized that "[t]he state must make reasonable efforts to reunify the family before terminating parental rights." *In re C.F.,* 113 Ohio St. 3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 4. In determining whether the agency made reasonable efforts, "the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re D.H.,* 6th Dist. Lucas No. L-13-1152, 2013-Ohio-5286, ¶ 21, citing *In re Myers,* 4th Dist. Athens No. 02CA50, 2003-Ohio-2776, ¶ 18. "[R]easonable effort" is an "'honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage.'" *Id.,* quoting *In re Weaver,* 79 Ohio App.3d 59, 63, 606 N.E.2d 1011 (12th Dist.1992).

{¶ 38} The record demonstrates that LCCS devised a thorough case plan setting forth what must be done before I.P. could be returned to B.P.'s custody. The activities and services set forth in that plan were designed to address the concerns that led to I.P.'s

16.

removal from the home, including B.P.'s substance abuse and mental health issues, her inability to control her anger without resorting to violent behavior, her lack of stable, safe, appropriate housing, and her inability to engage in safe and healthy relationships.

{¶ 39} B.P. made very slow progress and never completed the case plan objectives. Although she completed IOP, she voluntarily left Sparrow's House three times and was discharged from Naomi House for violating its rules. The caseworker testified that had she followed through with these programs, reunification would have been likely. Although there were scheduling issues in beginning treatment following her assault conviction, and complications caused by the overlap in services required of her by LCCS, the drug court, and the common pleas court, B.P. had sufficient time in which to complete the case plan services had she been diligent. The consequences of failing to complete the case plan were made clear to B.P. by her caseworker.

{¶ 40} We find B.P.'s third assignment of error notwell-taken.

### D. Fourth Assignment of Error

{¶ 41} In her fourth assignment of error, B.P. argues that the trial court erred when it allowed the LCCS caseworker to provide expert testimony about the difference between being "clean" and being "sober." She claims that without qualifying her as an expert witness, the trial court allowed the LCCS caseworker to distinguish between these two terms, then relied heavily on the distinction when it determined that B.P. was not sober and that I.P. could not be returned to her custody. She claims that she was also

17.

denied due process because she was not put on notice that the caseworker would be permitted to provide such expert opinions, thus depriving her of the opportunity to retain her own expert to provide rebuttal testimony.

{¶ 42} The admission or exclusion of evidence is a matter solely within the discretion of a trial court. *Miller v. Defiance Regional Med. Ctr.,* 6th Dist. Lucas No. L-06-1111, 2007-Ohio-7101, ¶ 17. A reviewing court may reverse a court's decision only where the trial court has abused its discretion. *Id.* To find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and was not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 43} In response to a number of questions from B.P.'s attorney about whether B.P. was "clean and sober," the caseworker stated that she believed B.P. to be "clean" but not "sober." It was clear that she perceived a difference between the two terms. On redirect, the attorney for LCCS asked her whether there was a difference between being "clean" and being "sober." The GAL objected to the testimony, stating, "I would object to qualifications to make decisions." The court overruled the objection and responded, "I think she's testified at the very beginning as to what her qualifications were in working with the treatment court."

{¶ 44} It is not clear exactly what the GAL meant by his objection to the caseworker's qualification to make "decisions." Assuming he meant to object to her ability to render expert opinions, we are not convinced that this testimony rises to the

18.

level of expert testimony. While it is evident that "clean" and "sober" are terms of art for those who treat addicts, in this context, the caseworker was merely describing what she meant in using these terms in response to questioning by B.P.'s counsel: "clean," as she used the term, described the absence of evidence of substance use, and "sober" described a change in behavior. We find no abuse of discretion—and no due process violation—in the trial court allowing her to clarify what she meant when she used those terms.

{¶ 45} We find B.P.'s fourth assignment of error not well-taken.

### III. CONCLUSION

{¶ 46} We find B.P.'s assignments of not error well-taken. We affirm the April 29, 2015 judgment of the Lucas County Court of Common Pleas, Juvenile Division. The costs of this appeal are assessed to B.P. pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                       _____
                                                        JUDGE
Stephen A. Yarbrough, P.J.

                                        _____
James D. Jensen, J.                                     JUDGE
CONCUR.

                                        _____
                                                        JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.