[Cite as *State v. Haugh*, 2016-Ohio-8008.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-15-1115

    Appellee                                 Trial Court No. CR0201402037

v.

John Joseph Haugh                          **DECISION AND JUDGMENT**

    Appellant                                Decided:  December 2, 2016

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Tim A. Dugan, for appellant.

* * * * *

**JENSEN, P.J.**

**{¶ 1}** Following a jury trial, defendant-appellant, John Haugh, appeals the

March 31, 2015 judgment of the Lucas County Court of Common Pleas, convicting him

of aggravated murder.  For the reasons that follow, we affirm the trial court judgment.

# I. Background

## A. Scott Warnka is Betrayed. Plans are Made to Retaliate.

{¶ 2} On April 13, 2014, Thomas Przybysz was arrested for possession of heroin, a fifth-degree felony. He was told by Toledo Police Sergeant, Kerrie Williams, that the charge would be dismissed if he led police to a higher-level drug offender. Przybysz agreed to assist. He led police to his long-time friend, Scott Warnka.

{¶ 3} Warnka was a drug dealer who sold drugs to Przybysz and Przybysz's co-workers. Przybysz would place orders for his co-workers and leave the money for the drugs in his car at work. Warnka would then come by around 10:00 p.m., collect the money, and leave the drugs that had been ordered. Przybysz told police of this arrangement.

{¶ 4} On May 14, 2014, an undercover officer arranged through Przybysz to buy $50 worth of cocaine from Warnka. The officer met Warnka in the parking lot. Following that transaction, Przybysz informed police that Warnka was going to be leaving town and wanted to get rid of about seven grams of cocaine. On May 21, 2014, Przybysz helped the undercover officer arrange another transaction. Przybysz told Warnka that the same customer had pooled his money with three other men and wanted to buy a quarter ounce of cocaine. The purchase price was $300. The officer met Warnka in the parking lot and exchanged the money for the cocaine. Police then swarmed the vehicle and arrested Warnka. He was charged with drug possession and

2.

trafficking and was taken to the Lucas County jail. Warnka quickly realized that Przybysz had set him up.

{¶ 5} Warnka was released from jail the next day on a $10,000 bond posted by his cousin, Roy Cerveny, his then-girlfriend (now-wife), Jessica Kinsey, and his drug supplier, Charles Holt, who picked him up. Almost immediately after posting bond, Warnka began texting Przybysz: "Guess who is out, you fucking snitch." And "I'm going to whoop your ass." Cerveny told Warnka that there was someone at his house who would take care of it and would "whoop [Przybysz's] ass" for him.

{¶ 6} After a few stops, Warnka, Jessica, Cerveny, and Cerveny's wife, Laura, went to the Cervenys' house. There were three men already gathered there, including Haugh. When Warnka saw Haugh, he knew immediately that it was Haugh who Cerveny had in mind to "whoop [Przybysz's] ass." Warnka started drinking and snorting cocaine, then sat down next to Haugh. They began talking about how Warnka had been set up, was angry, and wanted Przybysz's "ass whooped." Haugh asked Warnka where Przybysz lived. Warnka told him the street, about how far down the block he lived, what kind of car he drove, and what time he got off work.

{¶ 7} Around midnight, Cerveny took Warnka and Jessica home. The next morning, Warnka woke up and saw on a news channel that someone had been stabbed in Point Place in Toledo. Warnka recognized Przybysz's house on the news. Around the same time, he and Jessica turned on their phones and saw that there was a text message and a voice mail from Cerveny. The voice mail indicated that Warnka would be happy

3.

and the text said "a hundred dollars with a bunch of money signs." Warnka soon learned that Przybysz had died.

**B. Przybysz's Death.**

{¶ 8} Around 3:45 a.m. on May 23, 2014, Przybysz's neighbor called 9-1-1 from her home on 283rd Street. She reported that Przybysz had been stabbed and was at her front door covered in blood. Police and emergency crews responded and found Przybysz lying on the ground in front of the steps leading to his neighbor's door, conscious, but fading. He had been stabbed multiple times. As the life squad transported Przybysz to the hospital, he lost consciousness. He was pronounced dead at St. Vincent Hospital at 4:26 a.m.

{¶ 9} Investigating officers followed a blood trail which helped them piece together what had happened. They concluded that Przybysz was attacked on his porch upon returning from work as he tried to open his front door. The storm door was propped open by his book bag, which held his lunchbox, safety goggles, and gloves, and his keys were on the ground in front of the door. After he was stabbed, Przybysz went to the house just south of his, and knocked on the door. When no one answered, he knocked on the door two houses north of his—skipping the house immediately next to his, probably because he knew it was vacant. Przybysz dropped his cell phone, which was smeared with blood, in his driveway.

{¶ 10} The coroner determined that Przybysz had been stabbed at least 15 times in the neck, ear, chest, shoulder, back, hand, arm, thumb, and thigh. Some of the wounds

4.

were deep while others were superficial. His jugular vein was pierced, causing substantial hemorrhaging. His right lung was punctured and was filled with blood; both lungs had collapsed. He was stabbed with enough force to fracture his sternum and several ribs. His thumb was also severed and was hanging by only soft tissue.

### C. The Investigation Leads to Warnka, Cerveny, and Haugh.

{¶ 11} Toledo Police Detective Gregory Mattimore received information from two women who told him of Warnka's recent arrest and his visit to the Cervenys' house after posting bond. Detective Mattimore learned the names of the people who were at the Cerveny house in the hours leading up to Przybysz's murder. He went to the home and talked to Laura Cerveny who verified that Warnka, Cerveny, Haugh, and others had been at her house that night.

{¶ 12} Detective Mattimore also learned that on May 22, 2014, Przybysz called Sergeant Williams and told her that Warnka had been leaving threatening messages on his phone. Sergeant Williams instructed him to keep them because they could later charge Warnka with intimidation. She learned from a lieutenant the next day that Przybysz had been murdered.

{¶ 13} With the information obtained from these sources, Detective Mattimore was able to secure a number of warrants. He also interviewed Cerveny, Warnka, Haugh, and others that had been at the Cerveny home that night, including Mark Fisher, Kevin Reed, and C. J. Basilius.

5.

{¶ 14} Fisher told Detective Mattimore that he arrived at the Cervenys' house between 1:30 and 2:00 a.m. on May 23, 2014. Warnka had left by this point, but Fisher described that Cerveny and Haugh were "pretty fired up" about Przybysz's betrayal of Warnka. He recalled that Cerveny and Haugh said that "there needs to be something done," and that they needed to "kick his ass." He saw Haugh change his clothes from jeans and a "wife beater"-style tank top into a red sweat suit. He then left. About an hour later, Haugh called Cerveny to come pick him up, and about an hour after that, the two returned. Upon their return, they said that "it was done," and that Przybysz had gotten "his ass kicked." They said "he got what he deserved." Later that afternoon, Fisher learned that Przybysz had been killed. He realized that Haugh and Cerveny were involved.

{¶ 15} Reed said he arrived at the Cerveny home before Warnka and Cerveny. He heard Warnka ask Haugh to beat up Przybysz. He said Haugh nodded. Later he heard Warnka tell Haugh where Przybysz lived, what shift he worked, and what car he drove. He recalled that Haugh left around 2:00 or 2:30 a.m., then returned. Reed found out the next day that Przybysz had been killed and it made him wonder if Haugh had something to do with it.

{¶ 16} C. J. Basilius reported that he was living at the Cervenys' home and was there that night. He said Warnka arrived around 8:00 p.m. on May 22, 2014, and was upset about having been in jail. He said he wanted to go beat up Przybysz. Haugh told Warnka, "I got it for you." Basilius went to bed around 8:30 or 9:00 p.m., and was

6.

awoken around midnight or 1:00 a.m. Warnka and his girlfriend were gone by then. Basilius went back to bed a little while later and woke up for work at 5:00 a.m. Haugh was there. He heard Haugh say that Przybysz got what he deserved. He heard later that morning that Przybysz had been killed. At that point he started thinking that Haugh had something to do with it. The night before, however, the talk had been only that Haugh wanted to go over and beat him up.

### D. The Suspects Are Interviewed.

{¶ 17} Detective Mattimore interviewed Warnka, Cerveny, and Haugh. Initially, all three denied any involvement in Przybysz's murder. But after being arrested and charged with murder, Warnka and Cerveny became more forthcoming with the detective.

{¶ 18} Warnka admitted that he had been angry with Przybysz and began sending menacing text messages to him immediately after Cerveny, Jessica, and Holt posted his bond. He told the detective that Cerveny had connected him with Haugh, who he said would "take care of it" and "whoop [Przybysz's] ass." He described that he drank some alcohol, snorted some cocaine, and sat down next to Haugh to talk to him about it. He admitted that before he and Jessica left, around midnight, he provided Haugh with the information he would need to find Przybysz. His understanding was only that Haugh "was going to whoop [Przybysz's] ass."

{¶ 19} Warnka explained that he and Jessica had turned off their phones when they got home. He said that the next morning when they turned on their phones, there were a couple of text messages and a voice message left for Warnka on Jessica's phone.

7.

One text message was from Cerveny. It said "a hundred dollars with a bunch of money signs." Warnka interpreted the text to mean that Cerveny wanted to buy some cocaine. The voice mail was also from Cerveny, telling Warnka that he would be happy. At first he did not understand the voice mail message. But after watching the news and learning of Przybysz's stabbing, he realized what the voice mail message meant.

{¶ 20} Warnka later spoke with Cerveny. Cerveny told him that he picked up Haugh at around 4:00 a.m. from a church on 108th or 116th Street and Haugh had a cut on his finger. Cerveny said that he knew that Haugh had "went and killed [Przybysz]." Warnka said he was surprised. He said "it was never suppose [sic] to happen like that. * * * [Przybysz] was just suppose [sic] to get his ass whooped."

{¶ 21} Warnka was ultimately offered a plea agreement. In exchange for his agreement to testify truthfully against Haugh, he was permitted to enter a plea of guilty to first-degree involuntary manslaughter, which carries a potential sentence of 3-11 years instead of the 15 years-to-life sentence for murder.

{¶ 22} Cerveny also spoke to Detective Mattimore. He told him that Warnka had been complaining that night about having been set up by Przybysz, and he said he wanted someone to beat him up. Cerveny told him to talk to Haugh. Warnka said he was willing to pay someone $100. Haugh agreed to do it, but said he did not know what Przybysz looked like. Warnka showed Haugh a picture of Przybysz and told him where he lived, what kind of car he drove, and what time he got off work. Haugh said he would take care of it. Cerveny took Warnka and Jessica home around midnight.

8.

**{¶ 23}** Cerveny said that around 3:00 a.m., Haugh said he had to take care of something and left. He was wearing jeans and a t-shirt. He was carrying a book bag that he always carried with him that contained clothing and other things he needed to stay the night at people's places. He left on his bicycle. Around 4:00 a.m., Haugh called Cerveny and said he needed a ride. He said he hurt himself and sounded out of breath. Initially Cerveny could not find him. He called Haugh approximately three times. He eventually picked him up in Laura's minivan at a church on 116th Street. He did not have his bike with him—he said he left it by the church.

**{¶ 24}** Cerveny noticed that Haugh's hand was wrapped up. He asked what happened and Haugh said he cut it when he went for Przybysz. Haugh said he did not know how bad he hurt Przybysz and he wanted Cerveny to drive by his house. They did and they saw the rescue squads. Cerveny asked why there would be rescue squads and Haugh said he stabbed at Przybysz but missed the first time and was not sure "how good he got him because he cut himself." Cerveny concluded at that point that Haugh had hurt Przybysz a lot worse than he had agreed to, but he did not know that Przybysz was dead or dying. Haugh told Cerveny to call Warnka and tell him the job was done and he would be happy. Cerveny left that voice mail message. He also texted Warnka.

**{¶ 25}** Cerveny and Haugh arrived back at the Cervenys' house and Haugh asked for a first aid kit. He asked for something to put his gloves in because they were torn and there was blood on them. Haugh put the gloves in a cereal box and put the box in the trash.

9.

He put the knife in his backpack. Cerveny said Haugh was wearing a "wife-beater"-style tank top and shorts when he picked him up at 4:00 a.m.—he had changed clothes.

{¶ 26} Like Warnka, Cerveny agreed to testify against Haugh. In exchange, he was permitted to enter a plea of guilty to third-degree involuntary manslaughter and obstructing justice. Each carries a sentence of one to three years' imprisonment.

{¶ 27} Haugh never admitted any involvement in Przybysz's murder. Detective Mattimore asked him if he left the Cerveny home that night. He said he may have gone to a carryout to buy Long Island iced teas. Detective Mattimore checked the carryouts in the vicinity, however, and none were open until 3:00 a.m. Detective Mattimore asked Haugh what he was wearing. He said he wore a t-shirt and jeans that night and woke up the next morning wearing the same clothes. He denied having any conversations with Warnka that night, and he denied that anyone at the Cervenys' house had been upset. He described Warnka as happy.

### E. Other Evidence Points to Haugh.

{¶ 28} Police made a number of discoveries implicating Haugh in Przybysz's murder. For one, a patrol officer found an abandoned bicycle on May 23, 2014, in the stairwell of a church located at 116th and 297th Streets. Because it was out of place and because of the nearby homicide, investigators kept the bike. They ultimately found a spot of blood on it. DNA testing was performed and the blood was found to be consistent with Haugh's DNA. During questioning by Detective Mattimore, Haugh identified the bike as his and admitted that he rode that bike to the Cervenys' house on May 22, 2016.

10.

Przybysz's DNA was not found on the bike, however, and no other DNA evidence was found to link Haugh to Przybysz's murder.

{¶ 29} Investigators also recovered video surveillance from a homeowner, a gas station, and a school within the vicinity of the murder for the general time frame established by the investigation. Video from the gas station showed a minivan that looked like Cerveny's pass by around the time he said he picked up Haugh, and it was traveling in a direction that coincided with Cerveny's description of events. Video from the school—which is located at 4747 290th Street, between Cerveny and Przybysz's houses—showed someone ride by on a bicycle. The bicyclist was wearing sweats and appeared to carry a backpack. And video surveillance from the homeowner, who lived four or five houses away from Przybysz, showed a person riding a bike westbound on 108th Street, turn southbound onto 283rd Street, and cross the street. He was carrying a backpack. Approximately a minute-and-a-half later, a vehicle can be seen pulling up to a house and into a driveway. About two minutes later, the person on the bike can be seen riding northbound on 283rd Street, then eastbound on 108th Street. A porch light goes on a little less than three minutes after the bicyclist leaves, and emergency vehicles arrive about six minutes later.

{¶ 30} The police also obtained cell phone records for Haugh and Cerveny's phones. Those records evidenced a number of calls between 3:48 a.m. and 3:55 a.m. on May 23, 2014, as well as a call to Jessica at 4:08 a.m.

11.

{¶ 31} A couple of knives were found in the area in the weeks following Przybysz's murder, but they were never processed because they had been outside and exposed to the elements for so long. None was established to be the murder weapon.

{¶ 32} Police also recovered correspondence that Haugh mailed from the county jail to Laura and Roy Cerveny. The letter to Laura stated that Cerveny should not change anything that he told police initially. It said that the police had nothing and could not prove anything, and that they all needed to stay strong or they would "be screwed." It suggested that reasonable doubt could be established if the police pursued other drug dealers Przybysz had set up.

{¶ 33} In his letter to Cerveny, Haugh told him not to be scared. He said that the police had no evidence, no murder weapon, no DNA, and no eyewitnesses. He said that without a warrant, the police could not get phone records. He questioned the number of drug dealers Przybysz had "snitched" on. Haugh advised that as long as Cerveny did not take any deals, no one would be convicted. And he warned that if Cerveny allowed police to scare him into saying what they want him to say, he would be "sending [his] cousin to prison for 15 years or more, and sending John to the gas chamber, and sending yourself to prison for a long time." He insisted to Cerveny that he committed no crime and the state could not win at trial unless Cerveny took a deal.

{¶ 34} Finally, inmates from the Lucas County jail stepped forward with information. Brian Hackett-Foster was in jail in June of 2014, in connection with charges of first-degree aggravated vehicular homicide and second-degree aggravated vehicular

12.

assault. He and Haugh both resided on the sixth floor of the jail and slept on cots next to each other. Haugh talked to Hackett-Foster about his case. He said that the day of the incident, he was upset because someone stole some scrap from him and he was "sort of pissed off." He described that he went to a buddy's house to drink and party and a guy named Roy had been bonded out of jail. Haugh said he was upset because another guy had set him up in a drug deal. They wanted Haugh to go over and beat the guy up. Haugh told Hackett-Foster that around 3:30 or 4:00, Haugh went over and waited in the bushes for the guy to get off work. He got into a fight with the guy and Haugh said the guy had gotten the better of him, so he ended up stabbing him. Hackett-Foster revealed this information in the hope of using it to his advantage during plea negotiations in his own case. He ultimately entered a plea to third-degree aggravated vehicular homicide and third-degree aggravated vehicular assault in exchange for his cooperation in testifying against Haugh.

{¶ 35} Inmate Antwuan Lawson also provided information about Haugh. In June of 2014, he was incarcerated on charges of domestic violence. He and Haugh were involved in an altercation at that time. He met up with Haugh again in November of 2014, when Lawson was incarcerated on a charge of robbery. He told of an incident where Haugh was cooking inside his jail cell and was caught by a corrections officer. Haugh said if he saw the corrections officer again he would kill him. At first Lawson did not take the threat seriously, but Haugh later showed him a razor blade. Lawson did not report him at that time, but a couple of months later, Haugh was angry because his lawyer

13.

told him that Hackett-Foster was going to testify against him. He said if he got the chance, he was going to kill Hackett-Foster. Lawson saw what he believed to be a makeshift knife created from a homemade razor blade and a toothbrush, so he reported it, and Haugh and his cell were searched. He said he saw Haugh slash his mattress with the knife. The weapon was recovered. Lawson received nothing from the state in exchange for this information.

## F. The Jury Convicts Haugh.

{¶ 36} After a five-day jury trial, Haugh was convicted of aggravated murder. The trial court sentenced Haugh to life in prison without the possibility of parole. The conviction and sentence were memorialized in a judgment entry journalized on March 31, 2015. Haugh timely appealed and assigns the following errors for our review:

> 1) The State failed to produce legally sufficient evidence that Appellant committed Aggravated Murder.

> 2) Appellant's conviction for Aggravated Murder fell against the manifest weight of the evidence.

> 3) The Trial Court erred in allowing the State to introduce evidence it untimely disclosed mere days before trial.

## II. Law and Analysis

{¶ 37} In his first assignment of error, Haugh challenges the sufficiency of the evidence. In his second assignment of error, he argues that the jury's verdict was against the manifest weight of the evidence. And in his third assignment of error, he claims that

14.

the trial court erred in allowing the state to present evidence that was not timely disclosed.

{¶ 38} We address Haugh's first and second assignments of error together before turning to his third assignment of error.

### A. Sufficiency and Manifest Weight of the Evidence.

{¶ 39} Haugh was convicted of aggravated murder under R.C. 2903.01(A), which provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." Haugh contends that the state failed to prove the required mens rea of "prior calculation and design." He insists that the state presented evidence showing only that the plan was to assault Przybysz—not to kill him. As such, he argues, the evidence was insufficient to support a guilty verdict as to the crime of aggravated murder.

{¶ 40} Haugh also claims that there was a lack of physical evidence linking him to the crime. He says the video surveillance does not positively identify him as the bicyclist, and there is no evidence as to how long his blood was on the bike. He maintains that many of the state's witnesses had been charged with crimes and were seeking a reduction in both the seriousness of and sentences for those offenses in exchange for their testimony. And he contends that the jury should not have been permitted to consider Lawson's testimony about the homemade knife because it was unrelated to Przybysz's murder. He argues, therefore, that the jury's verdict was against the manifest weight of the evidence.

15.

{¶ 41} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

{¶ 42} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins at* 387. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin, 20 Ohio App.3d 172,* 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 43} Ohio courts recognize that to establish "prior calculation and design," the state must show that the accused killed the victim purposefully after devising a plan or scheme to kill. *State v. Davis*, 8 Ohio App.3d 205, 206-207, 456 N.E.2d 1256 (8th Dist.1982). "There must be some kind of studied analysis with its object being the means by which to kill." *Id.* "Momentary deliberation is insufficient." (Internal citations and quotations omitted.) *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 19-20. Whether there exists prior calculation and design is a factual determination determined on a case-by-case basis. *State v. Jones*, 91 Ohio St.3d 335, 345, 744 N.E.2d 1163 (2001).

{¶ 44} Here, the state presented evidence that Haugh agreed to "whoop Przybysz's ass." More than four hours after agreeing to do so, he rode off on his bike with his backpack, which held a change of clothes and a knife. He lay in wait in the bushes for Przybysz to return from work. Although Haugh claims there was no evidence that he intended anything more than to assault Przybysz, the evidence indicates otherwise. For one, he took the knife out of his backpack despite his purported plan only to beat up Przybysz. And even more telling is the viciousness of the attack itself and the severity of Przybysz's injuries—15 stab wounds to his neck, chest, back, arm, ear, leg, finger, shoulder, some of which were forceful enough to fracture bones. These factors demonstrate prior calculation and design—not momentary deliberation. *See, e.g., State v. Carter*, 7th Dist. Jefferson No. 05 JE 7, 2007-Ohio-3502, ¶ 128 ("By waiting outside [the

17.

victim's] home, [the defendant] demonstrated that he had a scheme designed to implement a calculated decision to kill.").

{¶ 45} Haugh suggests that his encounter with Przybysz could have started off as a fight that ultimately escalated. Again, however, we note that Haugh had taken the knife out of his backpack, and Przybysz suffered 15 stab wounds, some on his back, some on his front, and some defensive in nature. Haugh, on the other hand, walked away with only a cut on his finger. Accordingly we find that the state presented evidence going to each element of the offense of aggravated murder, and we find no error in the jury's verdict.

{¶ 46} As to the lack of physical evidence linking Haugh to the crime, "[p]hysical evidence is not required to sustain a conviction." (Internal citations omitted.) *State v. Malone*, 8th Dist. Cuyahoga No. 101305, 2015-Ohio-2150, ¶ 31. The Eighth District Court of Appeals explained in *State v. McFeeture*, 2015-Ohio-1814, 36 N.E.3d 689, ¶ 43-44 (8th Dist.):

> Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.
>
> Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind. Although it requires the drawing of inferences, circumstantial evidence and direct evidence

inherently possess the same probative value. The United States Supreme Court has long noted that circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence. The Ohio Supreme Court has also instructed that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.

(Citations and quotations omitted.)

{¶ 47} Here, the state presented evidence that Haugh agreed to "whoop Przybysz's ass" for setting up Warnka. Warnka provided him with the information necessary to find Przybysz. Haugh left the Cervenys' house on his bike carrying a backpack, and Przybysz's neighbor's video surveillance showed a man on a bicycle with a backpack ride by and cross the street to what appeared to be Przybysz's home. Within minutes after Przybysz's vehicle turned into the driveway, the bicyclist is seen pedaling away, and it is around this time that Haugh called Cerveny to ask for a ride. When Cerveny picked up Haugh, his finger was bleeding and he told Cerveny he cut himself when he stabbed at Przybysz. Cerveny saw Haugh dispose of bloody gloves and put his knife in his backpack. Haugh's blood was found on his bicycle. And Haugh also admitted to a cellmate that he stabbed Przybysz, and his letters from jail reflect his attempts to keep his co-defendants quiet. Any one of these facts alone may not have sufficed, but considered in their totality, the evidence certainly supports the jury's verdict.

19.

**{¶ 48}** As to the testimony from co-defendants and inmates who had a motive to fabricate their testimony, the jury was presented with their plea agreements. It was well-informed of the benefits received by the witnesses in exchange for their testimony. As such, the jury was free to assess the witnesses' credibility in light of this information. *State v. Rankin*, 10th Dist. Franklin No. 10AP-1118, 2011-Ohio-5131, ¶ 30. While we must act as a thirteenth juror when considering whether a verdict is against the manifest weight of the evidence, the jury is in the best position to make credibility determinations. *Id.* at ¶ 29. We decline to conclude that a conviction is against the manifest weight of the evidence merely because the jury believed the state's version of the facts over the defendant's. *Id.* at ¶ 29.

**{¶ 49}** We find Haugh's first two assignments of error not well-taken.

### B. Admission of Evidence that was not Timely-Disclosed.

**{¶ 50}** In his third assignment of error, Haugh argues that the trial court abused its discretion in allowing the state to present photographs that were not produced until the Friday before trial. He insists that trial counsel had no time to "adjust to, investigate, or otherwise question the accuracy" of the photos. He asserts that "a tactic like this by the State serves only to send a defendant's counsel reeling."

**{¶ 51}** The state denies that any discovery violation occurred, and points out that far from "reeling," trial counsel had time to file a motion to exclude the photographs. It also maintains that no discovery violation occurred, and even if a violation had occurred,

20.

the defendant bears the burden of demonstrating unfairness resulting from the late disclosure.

{¶ 52} The photos at issue included exhibit No. 35 (a photo of the victim's face at his autopsy, along with the autopsy number displayed), and exhibits Nos. 27-31 (photos of the church where Haugh's bicycle was found). The state claims that there was no surprise to Haugh and his counsel because a CD with the photos had been provided to trial counsel. It also observes that it could have requested a jury view in lieu of presenting the photographs at trial.

{¶ 53} The trial court allowed the parties to briefly argue the motion to exclude evidence. Trial counsel conceded that she had seen the autopsy photos before and that she had been to the church where the bike was found. The trial court found that there was no prejudice to Haugh.

{¶ 54} The admission or exclusion of evidence is a matter solely within the discretion of a trial court. *Miller v. Defiance Regional Med. Ctr.,* 6th Dist. Lucas No. L-06-1111, 2007-Ohio-7101, ¶ 17. A reviewing court may reverse a court's decision only where the trial court has abused its discretion. *Id.* To find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and was not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

21.

{¶ 55} Here, we agree with the trial court that Haugh failed to show that he was prejudiced by the failure to provide the handful of photos to trial counsel until the Friday before trial. We find no abuse of discretion in the trial court's decision.

{¶ 56} Accordingly, we find Haugh's third assignment of error not well-taken.

### III. Conclusion

{¶ 57} We find Haugh's three assignments of error not well-taken, and affirm the March 31, 2015 judgment of the Lucas County Court of Common Pleas. Haugh is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                                                    _____

                                                         JUDGE
Thomas J. Osowik, J.

                                                  _____
James D. Jensen, P.J.                                                 JUDGE
CONCUR.

                                                  _____
                                                         JUDGE