[Cite as *In re J.B.*, 2017-Ohio-406.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

In re J.B.

Court of Appeals No. WM-16-002

Trial Court No. 20152041

**DECISION AND JUDGMENT**

Decided: February 3, 2017

* * * * *

W. Kelly Johnson and Robert J. Karl, for appellant.

Katherine J. Zartman, Williams County Prosecuting Attorney, and
Michael L. Juhasz, Assistant Prosecuting Attorney, for appellee.

* * * * *

**JENSEN, P.J.**

**{¶ 1}** Defendant-appellant, J.B. ("Ju.B."), appeals the February 12, 2016 judgment of the Williams County Court of Common Pleas, Juvenile Division, adjudicating him delinquent on four counts of rape. For the reasons that follow, we reverse the trial court's judgment, in part, and affirm, in part. We remand the matter to the trial court for a new trial.

## I. Background

{¶ 2} On February 9, 2015, 15-year-old Je.B. was sent to the school guidance counselor by her gym teacher after the teacher noticed cuts on her wrists. The counselor spoke with Je.B. about why she had been cutting herself, and her response led the counselor to believe that Je.B. was in danger at home. She contacted Williams County Job and Family Services ("WCJFS").

{¶ 3} On February 10, 2015, investigators from WCJFS interviewed Je.B. She revealed to them that her 17-year-old brother, Ju.B., had been raping her since she was seven years old. She reported that he last raped her on his 17th birthday, in July of 2014, at which time he held her down, forced her to perform oral sex, then inserted his penis into her vagina. She said that before the July 2014 incident, the last time Ju.B. raped her was on his 16th birthday. She described that the rapes occurred at night, and her parents were either in their room or in the family's factory which is connected to the family's home. She said that Ju.B. threatened to kill her if she told anyone, but she told her mom what had been going on. She claimed her mother did nothing.

{¶ 4} In addition to the allegations of abuse by Ju.B., Je.B. told the investigators that while lying in bed with her father, he would put his hand on top of her clothes "on her vaginal region and on her butt, but his hand would just lay there." She told them she was unsure whether this was sexual abuse.

{¶ 5} That day, the WCJFS investigators and sheriff's deputy Ken Jacob went to Je.B.'s home to speak with her parents. Only her father, A.B., was home. They informed

2.

him of Je.B.'s allegations, and his immediate response was that Je.B. must be lying. He said that her behavior had recently changed, and he attributed this to her internet usage. He offered Deputy Jacob Je.B.'s electronic devices so that they could be searched.

{¶ 6} The investigators called their supervisor and decided that to ensure Je.B.'s safety, they would remove her from the home pursuant to an ex parte order from Williams County's juvenile court judge. They arranged for a medical evaluation of Je.B. by Randall Schlievert, M.D., a Toledo physician who specializes in treating children who may have been sexually abused.

{¶ 7} Dr. Schlievert examined Je.B. on February 19, 2015. Je.B. reported to him that Ju.B. had been sexually abusing her since she was seven years old, that he vaginally raped her numerous times, that he forced her to perform oral sex three times, that the instances of abuse often seemed to occur on Ju.B.'s birthday, and that the last instance occurred on his 17th birthday. She said it happened at their home and she tried to tell her parents about it, but they were protective of Ju.B and said that he was not the type of person who would do that. Je.B. told Dr. Schlievert that Ju.B. would choke, hit, and threaten to kill her.

{¶ 8} Dr. Schlievert performed a genital exam. He found a complete cleft of Je.B.'s hymen at the nine to ten o'clock position, meaning that there was an absence of hymenal tissue in that location, indicative of penetrating trauma. Dr. Schlievert saw no bruises, bleeding, scrapes, or swelling during the genital exam, but Je.B. had a couple

3.

dozen cuts on her left arm, some vertical and some horizontal, that she admitted were self-inflicted.

{¶ 9} Dr. Schlievert described that during the interview, Je.B. was emotional and tearful, and she reported having flashbacks. She was pinching her arms during the interview. Mainly, however, her affect was flat and depressive. Dr. Schlievert recommended that Je.B. undergo an urgent psychiatric evaluation. He believed that what Je.B. had reported to him was only "the tip of the iceberg," and that she would begin to reveal new details. Based on the physical findings, her history, and her behavior, he diagnosed her as sexually abused. He also believed that she was suffering from anxiety and post-traumatic stress disorder.

{¶ 10} After being in foster care for a couple of months, Je.B. did, in fact, make additional allegations of abuse. Investigators interviewed her again on April 2, 2015. At that time, Je.B. alleged that her parents were physically and verbally abusive and that her father had sexually abused her. She also provided more details of incidents with Ju.B. She claimed that her mother had once walked in on Ju.B. and Je.B. having sex, then walked out like nothing had happened. Je.B. also indicated that Ju.B. had sexually abused her in the basement of their grandmother's home.

{¶ 11} Ju.B. was charged with five counts of rape, violations of R.C. 2907.02(A)(2). The first count alleged that between April 19, 2006, and July 21, 2007, Ju.B. purposely compelled Je.B. to engage in oral sex; the second alleged that between April 19, 2006, and July 21, 2007, Ju.B. purposely compelled Je.B. to engage in vaginal

4.

intercourse; the third alleged that on or about July 21, 2013, Ju.B. purposely compelled Je.B. to engage in vaginal intercourse; the fourth initially alleged that on or about July 21, 2014, Ju.B. purposely compelled Je.B. to engage in oral sex, but the year was later amended to 2013; and the fifth alleged that on or about July 21, 2014, Ju.B. purposely compelled Je.B. to engage in vaginal intercourse.

{¶ 12} Following an adjudicatory hearing beginning January 4, 2016, and ending January 7, 2016, the court dismissed Count 1 of the complaint, but adjudged Ju.B. to be delinquent with respect to the remaining four counts. It committed Ju.B. to the legal custody of the Department of Youth Services ("DYS") for a minimum of one year to a maximum of age 21 as to each count, with Counts 2, 3, and 4 to run consecutively to one another, and Count 5 to run concurrently. It also ordered anger management and sex offender treatment and six months' probation. Ju.B. was prohibited from accessing the internet during his detention and was ordered to avoid contact with minor females following his release. The court reserved sex offender classification pending Ju.B.'s release from DYS.

{¶ 13} Ju.B. timely appealed and assigns the following errors for our review:

> Assignment of Error No. 1: The juvenile court erred in not suppressing Appellant's "confession" due to the failure to preserve the video of Appellant's interview.

5.

Assignment of Error No. 2:  The juvenile court erred in not suppressing Appellant's "confession" because Appellant's statements were involuntary given the lack of *Miranda* warnings and the use of coercion.

Assignment of Error No. 3:  The juvenile court erred in failing to appoint a guardian *ad litem* for Appellant given the conflict of interest between Appellant and his parents.

Assignment of Error No. 4:  The juvenile court erred in excluding as inadmissible hearsay a log of Appellant's sister's Skype conversations, which was compelling evidence of an ulterior motive for her accusations against Appellant.

Assignment of Error No. 5:  Appellant was denied effective assistance of counsel as a result of his trial counsel's failure to file a notice of alibi.

Assignment of Error No. 6:  A new trial should be ordered in this case due to the juvenile court's loss of the audio recording of the third day of trial, resulting in the inability to produce a complete transcript to the prejudice of Appellant's rights on appeal.

Assignment of Error No. 7:  The cumulative effect of the errors committed at trial denied Appellant of a fair trial and requires reversal.

## II. Law and Analysis

### A. Failure to Preserve the Recording of Ju.B.'s Confession

{¶ 14} Deputy Jacob interviewed Ju.B. at the sheriff's office on February 11, 2015. Before trial, Ju.B. filed a motion to dismiss the complaint or, alternatively, to suppress statements made by Ju.B. during that interview because the state failed to preserve a recording of the interview. The trial court denied Ju.B.'s motion. In his first assignment of error, Ju.B challenges the trial court's denial of his motion.

{¶ 15} On September 14, 2015, the court held a hearing on Ju.B.'s motion. Deputy Jacob and Ju.B. both testified. Deputy Jacob said that he contacted A.B. on February 11, 2015, and told him that he wanted to speak with Ju.B. A.B. indicated that Ju.B. was at school, but that he would contact him and have him go over and speak with him. Ju.B. went by himself to the sheriff's office. He told Deputy Jacob that his mother had told him to take a lie detector test. Deputy Jacob escorted Ju.B. to one of the office's two interview rooms. Of the two rooms, he selected the one less frequently used.

{¶ 16} After introducing himself, obtaining some basic information, and advising Ju.B. that he was free to leave at any time, Deputy Jacob told him of Je.B.'s accusation that he had been raping her vaginally and forcing her to engage in oral sex since she was seven years old. He told Ju.B. that Je.B. said that this had happened every year since she was seven. He asked Ju.B. if this was true, and he told him that if it was, he needed to find out from Ju.B. why it happened and how many times it happened.

7.

{¶ 17} Ju.B. denied the allegations. He said that he and Je.B. hated each other and that she had distanced herself from the family, isolating herself in her room with her iPod and refusing to do chores. After about an hour of questioning, during which Ju.B. consistently maintained that the allegations against him were untrue, Deputy Jacob told Ju.B. that they could do a computer voice stress analyzer ("CVSA"), and asked Ju.B. if he would be interested. Ju.B. consented. Department policy required that consent be obtained in writing from a parent before performing a CVSA on a minor, but Deputy Jacob proceeded with written consent obtained only from Ju.B.

{¶ 18} After the CVSA, Deputy Jacob showed Ju.B. the charts generated by the test and told him that the machine confirmed that he had not been completely truthful. After another hour of questioning, during which Ju.B. was upset and crying, Ju.B. admitted to having Je.B. perform oral sex on him in the living room when he was ten years old. He maintained that it happened only once, and it lasted three to five minutes.

{¶ 19} Quickly after making this admission, Ju.B. recanted, explaining that they started to engage in oral sex, but never really did because they heard the door open and thought their mom or dad was coming in from the shop. But Ju.B. said that later that evening, Je.B. was in his bedroom and they had sex. Again, he said it happened only once and it was when he was ten years old.

{¶ 20} Deputy Jacob told Ju.B. that it was obvious that he was keeping something from him. Ju.B. was sobbing. Deputy Jacob wanted to administer another CVSA to better determine how many times Ju.B. and Je.B. had engaged in sex. Ju.B. agreed to do

8.

another test. As with the first test, Deputy Jacob told Ju.B. that the second CVSA indicated deception. He asked additional questions to determine the frequency of the sexual acts, but Ju.B. maintained that it was just the one time. They talked for about a half-hour, then the interview ended.

{¶ 21} Ju.B.'s recollection of the interview was in some respects similar to Deputy Jacob's. He testified that his mother told him to go to the sheriff's office and ask for a lie detector test. When he got there, this is what he told the receptionist. Deputy Jacob walked out and led him to an interrogation room.

{¶ 22} Deputy Jacob started reading information about Je.B.'s allegations from some papers that were stapled together. Before that, Ju.B. knew that the reason for the interview had to do with Je.B., but he did not know exactly what it was. Ju.B. denied the allegations and said that Je.B. was lying. Deputy Jacob insisted that Je.B. could not have made up the accusations. Ju.B. told Deputy Jacob at least 15 to 20 times that it did not happen. This went on for about 30 to 45 minutes and Ju.B. became angry and started to cry. Ju.B. asked for a lie detector test. Deputy Jacob came back with the CVSA equipment and explained how it worked. He asked Ju.B. if he was sure he wanted to do it and Ju.B. said yes.

{¶ 23} After the test, Deputy Jacob asked Ju.B. how he thought he did and Ju.B. said that he thought he did well. But Deputy Jacob told him that, in fact, he had "failed miserably." This made Ju.B. even more upset and he began sobbing. This is the point where Ju.B. and Deputy Jacob's versions of events begin to diverge.

9.

**{¶ 24}** According to Ju.B., Deputy Jacob told him that if he admitted to the offenses, the worst that would happen is that he would be ordered to go to counseling. Ju.B. believed he could make the questioning stop if he just told Deputy Jacob what he wanted to hear. He said that he figured that if he did this, his parents could get Je.B. back and he would simply have to go to counseling. Ju.B., therefore, admitted to sexual contact with Je.B., but insisted that it happened only one time when he was eight years old—not ten years old, as Deputy Jacob recalled. Ju.B. said he picked that age because it was the first allegation Deputy Jacob read off of her statement. Ju.B. insisted that it was not the truth and he said it only because he thought Deputy Jacob would let him go if he did.

**{¶ 25}** Deputy Jacob did not let him go, however. Instead he insisted that he knew that Ju.B. had sexually abused Je.B. more than one time. He asked if Ju.B. wanted to take another lie detector test to nail down how many times it occurred. Again, Ju.B. consented. Afterward, Deputy Jacob asked him how he thought he did and Ju.B. responded "horrible." He explained that he thought he had done horribly because what he said—that he raped Je.B.—was not the truth. He said that this time, Deputy Jacob did not tell him whether he passed or failed, but he gave Ju.B. a piece of paper to write out a confession and walked out of the room. Ju.B. did not write anything down.

**{¶ 26}** Deputy Jacob denied that he asked Ju.B. to write out a confession. He also denied telling Ju.B. that counseling was the worst that could happen.

**{¶ 27}** This brings us to the substance of Ju.B.'s first assignment of error.

10.

**{¶ 28}** As noted earlier, Deputy Jacob interviewed Ju.B. in a room that is the less frequently-used of the two rooms. Both interview rooms have video cameras. The camera in the more frequently-used room runs continuously. Deputy Jacob testified that he believed that the camera in the less frequently-used room was motion-activated and did not record 24-hours a day. He indicated that because the room was not used as often, he believed recordings would be preserved longer.

**{¶ 29}** After the interview, Lieutenant Greg Ruskey, who also testified at the suppression hearing, asked Deputy Jacob if he wanted a copy of the interview. Deputy Jacob responded that he did not want a copy at that time. Around May 1, 2015, however, the prosecutor's office asked Deputy Jacob for a copy. Deputy Jacob forwarded the request to Lieutenant Ruskey, but Lieutenant Ruskey informed him that it had been overwritten. As it turned out, contrary to Deputy Jacob's purported belief that the camera was motion-activated, the camera was recording 24 hours a day. After approximately two months, the data is automatically overwritten. It was determined that Ju.B.'s interview was overwritten in mid-April.

**{¶ 30}** Ju.B. moved to dismiss the complaint or to suppress his statements based on the failure to preserve the recorded interview. The trial court denied the motion, finding that Ju.B. failed to prove (1) that a video recording of the interview actually existed; (2) that it was materially exculpatory; and (3) that the state acted in bad faith in failing to preserve the recording.

11.

**{¶ 31}** Appellate review of a motion to suppress is a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. On a motion to suppress, the trial court assumes the role of finder of fact and, as such, is in the best position to determine witness credibility and resolve factual disputes. *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 7, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). On appeal, we must accept the trial court's factual findings as true if supported by competent and credible evidence. *State v. Durnwald*, 163 Ohio App.3d 361, 2005-Ohio-4867, 837 N.E.2d 1234, ¶ 28 (6th Dist.). We then independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard. *State v. Jones-Bateman*, 6th Dist. Wood No. WD-11-074, 2013-Ohio-4739, ¶ 9, citing *State v. Claytor*, 85 Ohio App.3d 623, 626, 620 N.E.2d 906 (4th Dist.1993).

**{¶ 32}** The Ohio Supreme Court explained in *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, that the "suppression of materially exculpatory evidence violates a defendant's due process rights, regardless of whether the state acted in good or bad faith." *Id.* at ¶ 7. But where evidence is only "potentially useful," the failure to preserve the evidence does not violate a defendant's due process rights unless the defendant can show that the state acted in bad faith. *Id.* at paragraph one of the syllabus. "Bad faith" "generally implies something more than bad judgment or negligence." *Durnwald* at ¶ 30. "It imports a dishonest purpose, moral obliquity,

12.

conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." (Internal citations and quotations omitted.) *Id*.

{¶ 33} Ju.B. does not claim that the evidence was "materially exculpatory"; he concedes that it was merely "potentially useful." But he insists that the trial court erred in concluding that the state did not act in bad faith in failing to preserve the evidence. In response, the state maintains that the failure to preserve the recording was not done with a dishonest purpose, ulterior motive, or ill will.

{¶ 34} We first address the trial court's finding that Ju.B. did not establish that a recording existed. At the suppression hearing, Deputy Jacob testified that while he does not know for sure that a recording existed because he never saw it, he assumes the interview was properly recorded. And Lieutenant Ruskey testified that there was a camera in the room and to his knowledge, it was recording on the day Ju.B. was interviewed. He said the camera has not malfunctioned. We, therefore, find no support for the conclusion that no recording existed.

{¶ 35} We now turn to the issue of bad faith. Ju.B. claims that bad faith is evidenced by the fact that (1) Deputy Jacob knew that the interview was recorded, (2) he considered the video to be important evidence and the "best evidence" of what occurred during the interview, (3) he declined Lieutenant Ruskey's offer to copy the video immediately following the interview, (4) he could have obtained a copy of the video by requesting it anytime within two months of the interview, (5) he failed to request a copy of the interview even after learning that Ju.B. had been charged, and (6) as a result of his

13.

failure to request a copy, it was automatically overwritten. Ju.B. also points out that Deputy Jacob was an 18-year veteran of the force and specialized in dealing with digital evidence. He contends that Deputy Jacob exhibited a "cavalier attitude" toward the preservation of the recording and completely and utterly failed to safeguard this potentially useful evidence.

{¶ 36} In support of his position, Ju.B. cites our decision in *Durnwald*, 163 Ohio.App.3d 361, 2005-Ohio-4867, 837 N.E.2d 1234 (6th Dist.). In *Durnwald*, the appellant was arrested on several traffic violations, including driving under the influence. There had been a recording that captured appellant's driving before being stopped and his performance of field sobriety tests. That recording was unavailable because cadets who were left alone in the trooper's vehicle during a training session allegedly erased and taped over it. Appellant argued that because this was the only evidence that could have refuted the officer's testimony as to his condition at the time of the stop, due process required dismissal of the charges. We concluded that the evidence was potentially useful, as opposed to materially exculpatory, and proceeded to consider whether the destruction of the recording constituted bad faith.

{¶ 37} Evidence was presented that the Ohio State Highway Patrol policies required that all traffic stops, pursuits, and crash scenes be recorded on videotape and preserved until all criminal and civil actions have been completed. The appellant requested the tape of his stop within a few days after it was made. The trooper, who had viewed the video, testified that for a DUI arrest, the practice was to leave a tape in the

14.

machine until the tape was fully used. The tape could easily be removed from the recorder in the trunk of the cruiser, and the only action he took to preserve the tape was to not turn the recording system on. Nevertheless, the videotape was partially erased. Notably, the tape would have had to have been rewound in order to record over appellant's stop.

{¶ 38} We observed that the videotape had obvious evidentiary value, was likely to be requested, and should have been preserved just as with any other evidence of an alleged crime. We found it "incredible that such 'accidental' erasures continue to occur." *Id.* at ¶ 35. While we recognized that the trooper's actions may not have been intentional, we also recognized that the erasure was not caused by machine malfunction. "Rather, the erasure occurred due to the trooper's complete and utter failure to safeguard evidence relevant to a crime and arrest." *Id.* at ¶ 36. Because of the ease of preserving the tape, the Highway Patrol's own policy requiring its preservation, and the failure to protect and preserve the videotape under these circumstances, we determined that the trooper's conduct constituted "more than mere negligence or an error in judgment." *Id.* To the contrary, we found that the continuing cavalier attitude toward the preservation of DUI videotape evidence rose to the level of bad faith. We held that any testimony by the trooper regarding evidence which may have been recorded by the videotape should have been suppressed.

{¶ 39} We reach the same conclusion here. Lieutenant Ruskey specifically asked Deputy Jacob if he wanted a copy of the recording of the interview and Deputy Jacob

15.

declined.  Even after charges against Ju.B. were formally filed, Deputy Jacob failed to request the recording.  Deputy Jacob acknowledged that requesting the recording would have been easy.  And he agreed that recordings of interviews should be safeguarded to the same extent as the recording devices in the patrol cars—that is, as per department policy, they should be preserved until the case is completely disposed of.  We find that Deputy Jacob's failure to safeguard the recording rises well above the level of mere negligence.  Accordingly, we conclude that the trial court erred when it denied Ju.B.'s motion to suppress statements obtained from Ju.B. during the February 10, 2015 interview.

{¶ 40} We find Ju.B.'s first assignment of error well-taken.  Our finding necessitates that Ju.B. be granted a new trial.

### B.  Failure to Appoint a Guardian Ad Litem

{¶ 41} In light of our conclusion with respect to Ju.B.'s first assignment of error, we need not consider his second assignment of error, alleging that Ju.B.'s "confession" should be suppressed because it was not given voluntarily.  We, therefore, turn to Ju.B.'s third assignment of error.

{¶ 42} In his third assignment of error, Ju.B. argues that the trial court erred in failing to appoint a guardian ad litem.  Ju.B. maintains that there existed a conflict of interest with his parents requiring appointment of a guardian ad litem because (1) another child in the household was the victim of the alleged abuse, (2) Ju.B.'s father had also been accused of sexual abuse and his mother was accused of standing by while Je.B. was

16.

raped by her brother, and (3) Ju.B.'s parents were despondent over Je.B.'s removal from the home and were, therefore, providing Ju.B. with questionable guidance. Therefore, he argues, it was incumbent on the court to appoint a guardian ad litem for Ju.B.

{¶ 43} The state, on the other hand, urges that Ju.B.'s parents repeatedly accused the victim of lying, voluntarily surrendered custody of the victim before trial, and "were in [Ju.B.'s] corner every step of the way." It also points out that this issue was not raised in the trial court, thus, it contends, the assignment of error must be reviewed under a plain-error analysis.

{¶ 44} R.C. 2151.281(A) requires the court to appoint a guardian ad litem to protect a child's interest if it finds that there "is a conflict of interest" between the child and the child's parent. Juv.R. 4(B) requires a juvenile court to appoint a guardian ad litem to protect the interests of a child where the interests of the child and the interests of the parent "may conflict." The juvenile court is in the best position to determine whether a potential conflict of interest exists between the parent and child, and we review the court's determination for an abuse of discretion. *In re Sappington*, 123 Ohio App.3d 448, 454-455, 704 N.E.2d 339 (2d Dist.1997). "The question is whether the record 'reveals a strong enough possibility of conflict of interest between parent and child to show that the juvenile court abused its discretion' by not appointing a guardian ad litem." *State v. Legg*, 2016-Ohio-801, 63 N.E.3d 424, ¶ 17 (4th Dist.), citing *Sappington* at 454.

**{¶ 45}** Because we have concluded that Ju.B. must be granted a new trial, we find that this issue may be visited with the juvenile court on remand. We, therefore, decline to resolve Ju.B.'s third assignment of error.

### C. Exclusion of the Victim's Skype Conversations

**{¶ 46}** Ju.B.'s defense to Je.B.'s allegations was essentially that Je.B. found her living environment intolerable and would go to the length of fabricating allegations of sexual assault in order to escape that environment. To that end, Ju.B. offered photographs of the living conditions in the family's home, and he presented testimony that A.B. and D.B. were very strict, required Je.B. to work long hours at the family business, sometimes from 6:00 a.m. to 11:00 p.m., and would not allow her to date. Ju.B. also sought to establish that Je.B. was obsessed with a 19-year-old man named H.C., with whom she corresponded via Skype messaging. Ju.B. attempted to admit into evidence a log of Je.B. and H.C.'s Skype messaging, which included over 14,000 messages exchanged at all hours of the day and night. This log also contained messages purportedly exchanged between Je.B. and her friend, Ap.B. In his fourth assignment of error, Ju.B. argues that the trial court erred when it excluded the log from evidence.

**{¶ 47}** Ju.B. hired Vestige Digital Investigations to perform a forensic analysis of the electronic devices used by Je.B. This analysis revealed a Skype chat thread consisting of 14,670 messages between December 30, 2014, and February 10, 2015, between usernames that Ju.B. claimed belonged to Je.B. and H.C. There was another

18.

chat thread consisting of 1,268 messages between January 7, 2015, purportedly between Je.B. and Ap.B.

{¶ 48} On cross-examination, defense counsel confronted Je.B. with the Skype chat log. She admitted that she engaged in Skype chats with H.C. and Ap.B., including during the middle of the night and during the school day, but she denied that the username reflected in the log belonged to her. Despite the fact that her photo was attached to the username and she was the only person in the household that used Skype, she maintained that it was not her username. Counsel attempted to question Je.B. about the substance of the log and tried to admit it into evidence, but the trial court excluded it for lack of authentication.

{¶ 49} During Ju.B.'s case-in-chief, Ju.B. again tried to admit the log, this time through Nick Ventura, the Vestige employee who had examined the devices and extracted the information. Again, the trial court excluded the logs, but this time it did so on the ground that it constituted inadmissible hearsay.

{¶ 50} Ju.B. argues that the trial court erred in excluding this evidence because the chat log was offered not for the truth of the matter asserted, but rather to demonstrate that Je.B. had an ulterior motive for fabricating accusations against Ju.B. He claims that the trial court abandoned its first-stated reason for excluding the log—the lack of authentication.

{¶ 51} The state counters that (1) Ju.B. sought to prove the truth of the statements contained in the log, (2) the log was never properly authenticated because the author of

19.

the statements was never identified, (3) the log was inadmissible under Evid.R. 609, and (4) the outcome of the case would not have been different had the log been admitted.

{¶ 52} The admission or exclusion of evidence is a matter within the discretion of the trial court. *Miller v. Defiance Regional Med. Ctr.,* 6th Dist. Lucas No. L-06-1111, 2007-Ohio-7101, ¶ 17. A reviewing court may reverse a court's decision only where the trial court has abused its discretion. *Id.*

{¶ 53} Here, the third day of trial was not able to be transcribed because of a malfunction of the courtroom recording system. The parties prepared a summary of the evidence, and the summary indicates that the second time the trial court excluded the log, it did so on hearsay grounds—not on authentication grounds. We understand and agree with this given that by the time Ventura testified, Ju.B. had presented sufficient evidence establishing that Je.B. was the only one in the home who used the electronic devices and was the only one who used Skype, thus properly authenticating the log. *See State v. Norris*, 2d Dist. Clark No. 2015-CA-22, 2016-Ohio-5729, ¶ 39 ("While the typical means of authenticating text messages, i.e., having the recipient of the text messages testify and identify the sender, was not implemented here, we nevertheless find the text messages were properly authenticated, as the state presented testimony and evidence that sufficiently linked Norris to the iPhone that contained the text messages at issue."). But as to the hearsay basis for denying the logs, we cannot say that the trial court abused its discretion.

20.

{¶ 54} Ju.B. insists that the statements contained in the log were not offered for the truth of the matter asserted, but rather to demonstrate that Je.B. had a motive for fabricating the allegations against Ju.B. The state urges that Ju.B. did, in fact, attempt to prove the truth of the matters asserted because when cross-examining Je.B. about the messages, defense counsel asked Je.B. if she had, in fact, failed a biology exam and burned her hand as represented in the messages.

{¶ 55} Certainly, we do not find the state's examples compelling because defense counsel clearly asked Je.B. about her biology exam and burned hand in an attempt to authenticate the log and establish that they were, in fact, messages between Je.B. and H.C. or Ap.B. But whether Ju.B. can overcome hearsay concerns as to any other statements he intended to highlight is something we cannot determine because those statements were never proffered. And while Ventura could appropriately testify as to the number of messages he extracted from the devices and the method of extracting them, the statements contained in those logs could not properly be admitted through him. We, therefore, find no abuse of discretion in the trial court's decision to exclude the log from evidence.

{¶ 56} We, therefore, find Ju.B.'s fourth assignment of error not well-taken.

### D. Remaining Assignments of Error

{¶ 57} Because our resolution of Ju.B.'s first assignment of error necessitates reversal and remand for a new trial, we need not consider his fifth, sixth, and seventh

assignments of error (counsel's failure to file a notice of alibi, loss of the recording of day three of trial, and cumulative effect of errors).

### III. Conclusion

{¶ 58} We find Ju.B.'s first assignment of error well-taken; therefore, we reverse and remand for a new trial on Counts 2 through 5 of the complaint. We find Ju.B.'s fourth assignment of error not well-taken, and we decline to consider his second, third, fifth, sixth, and seventh assignments of error in light of our resolution of his first assignment of error.

{¶ 59} The February 12, 2016 judgment of the Williams County Court of Common Pleas, Juvenile Division, is reversed, in part, and affirmed, in part, and the matter is remanded to the juvenile court for a new trial on Counts 2 through 5 of the complaint. The state is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed, in part,
and affirmed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.

Stephen A. Yarbrough, J.

James D. Jensen, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE