[Cite as *In re E.Z.-S.*, 2019-Ohio-1177.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY

In re E.Z.-S.
Court of Appeals No. F-18-006

Trial Court No. 19318

**DECISION AND JUDGMENT**

Decided: March 29, 2019

* * * * *

Autumn D. Adams, for appellant.

Scott A. Haselman, Fulton County Prosecuting Attorney, and
Todd Guelde, Assistant Prosecuting Attorney, for appellee.

* * * * *

**OSOWIK, J.**

**{¶ 1}** This case began with the filing of a complaint by the Fulton County

Department of Job and Family Services ("FCDJFS") in the Fulton County Court of

Common Pleas, Juvenile Division, on March 15, 2018. FCDJFS requested jurisdiction

over E.Z.-S., aged eight, whom it alleged was a "dependent" child, as defined by R.C.

2151.04(C). At the time, E.Z.-S. lived with his mother, "E.Z." (hereinafter "Mother"). The complaint alleged that Mother had recently overdosed, and was addicted to drugs, including heroin.

{¶ 2} According to the complaint, Mother and E.Z.-S. returned to Archbold, Ohio from Texas in January of 2018, and E.Z.-S. enrolled in the public elementary school there. Mother's boyfriend lived with them. On February 18, 2018, E.Z.-S. could not wake his Mother and called a family member, who contacted rescue services. At the hospital, Mother was given a "small dose of Narcan, which increased her alertness." Mother told authorities that she had taken "a muscle relaxer [and] an edible." She admitted to previous heroin use but denied using it that day. Mother's boyfriend allegedly experienced his own non-fatal overdose earlier in the week.

{¶ 3} According to the complaint, FCDJFS contacted E.Z.-S.'s elementary school counselor, who reported that, in the short time E.Z.-S. had been enrolled there, he had soiled himself four times, most recently while not wearing any underwear and that E.Z.-S. wore the same clothes every day. E.Z.-S. told the school counselor that he was "scared at home with his family"; that mother's boyfriend "watches bad movies and smokes bad things"; that "there was no food in the house"; and that Mother "never knows what's going on [and] doesn't know where she is when she wakes up." E.Z.-S. told his counselor that he needed "a break" and "to get away from mom."

{¶ 4} The complaint further alleges that E.Z.-S. told a FCDJFS caseworker (identified in the complaint as "cw") that he found needles in the house; that Mother

2.

hides drugs in a shed outside or in a crawlspace in the house; that mother's drug dealer is a woman named "Shawn"; and that he had witnessed Mother and boyfriend put belts on their arms and then insert needles. A police search of Mother's home on March 6, 2018, revealed a used marijuana joint.

**{¶ 5}** On April 3, 2018, "B.S.," the Father of E.Z.-S. (hereinafter "Father") filed a motion requesting that the court award him legal custody of E.Z.-S.

**{¶ 6}** An adjudicatory hearing was held on April 25, 2018. Mother attended the hearing and was represented by counsel. Father, who is a resident of Fayetteville, Georgia, attended the hearing by telephone and was also represented by counsel. At the hearing, Mother admitted to a substance abuse problem, and both parents consented to a finding of dependency. The court set the matter for a dispositional hearing on June 13, 2018, and it explained that possible dispositions included, but were not limited to, Mother retaining custody of E.Z.-S., with protective services being provided by FCDJFS, or Father gaining legal custody of E.Z.-S.

**{¶ 7}** At the dispositional hearing, the ongoing caseworker, Jessica Buhrman, testified that Mother tested positive for Heroin Metabolite, Morphine, Fentanyl, and Tramadol on February 22, 2018, four days after her overdose. Mother tested positive again for Fentanyl on February 27, 2018. Mother attended a ten day "partial hospitalization" and then began drug treatment at the ZEPF Center in Bowling Green. According to Buhrman, Mother attended two group sessions at ZEPF, but missed four. There was then a lapse of services "for about a month or so" when Mother "moved back"

3.

to Archbold. Mother told Buhrman that she "didn't really have a good reason [for the lapse] other than just feeling down and depressed." Mother had a "positive screen" on March 13, 2018. Mother sought drug treatment at Recovery Services in Archbold, but she had "multiple no-shows" in May and June 2018. Similarly, Mother had "off and on" contact with the FCDJFS, which she blamed on transportation problems. Mother had another positive drug screen on June 7, 2018.

{¶ 8} Father also attended the dispositional hearing. He testified that he is the operations manager at a sporting goods company in Fayetteville, Georgia where he lives with M.S., his 12-year-old son. M.S. is a full-blooded brother to E.Z.-S. Father also lives with his wife of five years, F.S. (hereinafter "Stepmother"). Father, Stepmother and M.S. have lived in Fayetteville for about a year and one-half, in a home that they own. Father serves as an assistant pastor in his church and as chairman of religious affairs for the NAACP in Fayetteville.

{¶ 9} Father testified that before he and Mother split up, they lived in Atlanta with their two boys. When E.Z.-S. was six months old, Mother moved back to Archbold to help care for her own father. Father followed a short while later and got a job as a manager at Sauders Furniture in Archbold. After about nine months together in Archbold, Mother attacked Father, putting a "hole in [his] leg with her boots" and scratching his neck. Mother was arrested and spent three days in jail. Father then returned to Atlanta with M.S., but without E.Z.-S. According to Father, he wanted to bring E.Z.-S., who was quite young at the time, but Mother disapproved. They agreed

4.

that E.Z.-S. would spend the summers in Atlanta with Father once the boy turned three or four, but Mother never allowed it to happen, despite Father's request "every summer." Accordingly, Father would return to Ohio (or Texas where Mother lived for a time) "at least twice a year, in addition to holidays to visit with [E.Z.-S.]." The visits typically lasted three to five days, and he would normally bring M.S. and Stepmother with him. On those visits, Father would take E.Z.-S. shopping for clothes because he was dressed in "dirty [and] rag like clothes." When they were apart, Father tried to maintain consistent telephone contact, but, according to him, Mother made that difficult. After the complaint was filed, Father contacted E.Z.-S.'s school and was able to talk to his son with the help of the school guidance counselor.

{¶ 10} Father has four other children (besides M.S. and E.Z.-S.): a daughter with a master's degree, a son with a degree in biology, and two more sons who are college seniors. Father also helped to raise his sister's three sons (for six years), all of whom he helped graduate from high school. Father testified that he has made his children's education a priority and would do the same for E.Z.-S.

{¶ 11} Father also met with E.Z.-S.'s school counselor and principal who told him that E.Z.-S. initially misbehaved at school but responded well to a reward system and that he was in need of "structure at home, discipline and stability," all of which Father testified he could provide. As for reports that E.Z.-S. was soiling his pants and "needed a break," Father opined that E.Z.-S. was "stressed out * * * because he * * * has been in a parental role, trying to protect his mother." Father testified that, if he was granted

5.

custody, E.Z.-S. would "immediately" receive counseling and therapy services and, if necessary, tutoring, in Georgia. Father said that he had already taken some steps in that regard, in anticipation of their return.

{¶ 12} Finally, Father said that he and Stepmother would provide a loving, stable, and safe environment in Georgia. Father expressed his fear for E.Z.-S.'s well-being in Mother's home, commenting, for example, that "if those needles are stuck into my son[], just one time, it exposes him to a lot of harm." Still, he recognized Mother's "important role" in E.Z.-S.'s life and maintained that she would be welcome to visit E.Z.-S. in Georgia. He would also allow significant telephone contact.

{¶ 13} Stepmother testified that E.Z.-S. is a loving child; that they have a good relationship; and that she was prepared to do what was necessary to aid in his transition if E.Z.-S. came to live with them. She testified that M.S. plays "travel league" basketball, and they would find similar opportunities for E.Z.-S., depending on his interests.

{¶ 14} The record includes a "Home Evaluation" completed by the Fayette County Department of Family and Children Services, in Georgia. It indicates that Father and Stepmother were found to be physically and mentally capable of meeting the needs of E.Z.-S. and that their home met the department's safety criteria.

{¶ 15} Finally, Mother testified. She stated that she had just begun working for a painter. She admitted to an addiction to Percocet and heroin and to feeling "very depressed." Mother blamed any missed drug rehabilitation appointments on the fact that she did not have a functioning car. Mother opined that it was *not* in E.Z.-S.'s best

6.

interest to live with Father because E.Z.-S. was "so connected" with Mother and because Father had not spent "adequate time to get to know his son emotionally." When asked why E.Z.-S. was soiling his pants and telling the school that he "needed a break," Mother offered that he "loves attention."

{¶ 16} FCDJFS urged the court to award custody of E.Z.-S. to Father, based upon Mother's failure to "adequately follow[] the case plan." At the conclusion of the hearing, the trial court awarded legal custody of E.Z.-S. to Father, effective immediately, and it awarded parenting time to Mother, "as agreed by the parties." Mother appealed. Through appellate counsel, she assigns three assignments of error:

> Assignment of Error 1: The Trial Court committed plain error when it awarded legal custody of the Minor Child to Appellee as the Trial Court failed to appoint a Guardian ad Litem to represent the Minor Child's best interest.

> Assignment of Error 2: The Trial Court's decision to award legal custody to Appellee was improper as Appellee failed to abide by the requirements of Ohio Revised Code Section 2151.353 (A)(3).

> Assignment of Error 3: The Trial Court's decision to award legal custody to Appellee while Appellant was compliant with case plan services was against the manifest weight of the evidence as the Minor Child was in the custody of a parent and not in the "foster care drift" which required the Trial Court to award legal custody to Appellee.

7.

**Failure to Appoint a Guardian ad Litem**

{¶ 17} Mother alleges that the trial court had a statutory duty under R.C. 2151.281(B)(2)(b) to appoint a guardian ad litem (a "GAL") and that its failure to do so constitutes plain error.

{¶ 18} R.C. 2151.281(B)(2) governs the appointment of a GAL in a dependency proceeding. It provides that, "the court shall appoint a guardian ad litem, subject to rules adopted by the supreme court, to protect the interest of a child in any proceeding concerning an alleged dependent child if any of the following applies: * * * (b) [t]here is a conflict of interest between the child and the child's parents, guardian, or custodian." Likewise, Juv.R. 4 (B) provides that the "court shall appoint a guardian ad litem to protect the interests of the child * * * in a juvenile court proceeding when: (2) [t]he interests of the child and the interests of the parent may conflict; * * *." *See also In re A.K.*, 9th Dist. Summit No. 26291, 2012-Ohio-4430, ¶ 14. ("[T]he juvenile court's obligation to appoint a guardian ad litem in cases alleging only dependency is a qualified one, which depends upon the facts and circumstances of each case."). The juvenile court is in the best position to determine whether a potential conflict of interest exists between the parent and child, and we review the court's determination for an abuse of discretion. *In re J.B.*, 6th Dist. Williams No. WM-16-002, 2017-Ohio-406, ¶ 44 (Discussing the appointment of a GAL in a delinquency proceeding under R.C. 2151.281(A)) citing *In re Sappington*, 123 Ohio App.3d 448, 454-455, 704 N.E.2d 339 (2d Dist.1997).

8.

**{¶ 19}** Mother concedes that because she did not object to the trial court's failure to appoint a GAL, we may reverse the trial court's decision only if the failure to appoint a GAL constituted plain error. *See, e.g., In re I.N.*, 5th Dist. Stark No. 2011CA00011, 2011-Ohio-4572, ¶ 18-20 (Dependency proceeding); *See also In re B.E.*, 4th Dist. Highland No. 13CA26, 2014-Ohio-3178, ¶ 18 (No plain error for failure to appoint GAL under R.C. 2151.281(C) [regarding incompetent adults] in absence of evidence that appointment of GAL would have affected the outcome of the proceedings.). *Compare In re A.G.B.*, 173 Ohio App.3d 263, 2007-Ohio-4753, 878 N.E.2d 49 (4th Dist.) (In a neglect case, mother's failure to object at trial over the absence of a GAL does not waive argument on appeal because obligation to appoint a GAL in neglect and abuse cases was "mandatory" and therefore a de novo standard of review applies. Trial court's failure to appoint a GAL under R.C. 2151.281(B)(1) required a remand.). Courts should exercise extreme caution when invoking the plain error doctrine, especially in civil cases. Thus, "the doctrine is sharply limited to the *extremely rare* case involving *exceptional* circumstances where the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself." (Emphasis in original.) *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122-123, 679 N.E.2d 1099 (1997).

**{¶ 20}** Here, Mother argues that the appointment of a GAL was required due to "an inherent conflict of interest" between E.Z.-S. and Father. She claims that a conflict of interest was evidenced by the fact that Father and E.Z.-S. had only "minimal contact" with one another since E.Z.-S. was a year old; that E.Z.-S. had lived his entire life in

9.

Mother's care, and that Father would be "uprooting [E.Z.-S.] from his current situation and moving [him] to Georgia."[1]

{¶ 21} Mother further claims that Father and son spent minimal time together. The record establishes that it was Mother who refused to allow E.Z.-S. to spend summers with Father. Further, we agree with the argument put forth by FCDJFS, that Father and E.Z.-S. shared a common interest that E.Z.-S. "get away from mom," who was in the throes of drug addiction. Indeed, the unequivocal evidence presented at trial established that E.Z.-S.'s home was dangerous, and his interest in being rescued from that environment aligns with Father's interest in removing him from that place. Therefore, we do not agree that a conflict of interest existed between Father and E.Z.-S. that required the appointment of a GAL.

{¶ 22} Moreover, even if a conflict did exist, Mother has not demonstrated the existence of prejudicial error. That is, Mother has not demonstrated that, if a GAL had been appointed, that the GAL would have opposed Father's motion for a change in custody and/or that the trial court would have ruled differently. Mother's argument, that

---

[1] Mother does not argue that a conflict of interest existed between herself and E.Z.-S. Indeed, her initial plea of "true" to the charge of dependency would not support a finding that a conflict of interest existed. *In re A.K.* at ¶ 20. On the other hand, Mother's decision to contest Father's motion for legal custody signaled her intention of "protecting her own parental rights that did not necessarily represent her child['s] best interest. *In re A.K.* at ¶ 21. Inasmuch as Mother does *not* argue that such a conflict existed here, we confine our analysis to Mother's argument on appeal, i.e. that a conflict of interest existed between Father and E.Z.-S.

10.

she provided "the only home that [E.Z.-S.] has ever known" does not convince this court that a GAL would have sided with her, especially given the stark contrasts of the parent's respective living conditions and Mother's failure to remain compliant with her drug rehabilitation program. The record gives us no reason to believe that a different result would have occurred in the case had a GAL been appointed. *Accord K.J.D.*, 10th Dist. Franklin Nos. 12AP-652, 12AP-653, 2013-Ohio-610, ¶ 51 (Mother failed to show prejudicial error by trial court's refusal to allow her GAL to cross-examine witnesses where evidence established that Mother "continually failed to make progress in dealing with her substance abuse and mental health issues, that she did not comply or follow through with her case plan or the various treatment programs * * * and that she failed to find regular employment or stable housing.").

{¶ 23} Mother also argues that the appointment of a GAL "was required to aid the Trial Court in determining the best interests of the child." A best interest analysis does not trigger the need for a GAL, although Mother is generally correct that, once appointed, a GAL's role is to assist the court in determining the best interests of a child. *See* R.C. 2151.281(I) (A GAL "shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child."). We address Mother's best interest arguments in response to her third assignment of error.

{¶ 24} We find that Mother has failed to establish that a conflict of interest existed between Father and E.Z.-S., or that a different result would have occurred had the court

11.

appointed a GAL. Therefore, Mother failed to establish a case of plain error, and her first assignment of error is not well-taken. *Accord In re K.R.*, 12th Dist. Warren Nos. CA2017-02-015, CA2017-02-019, CA2017-02-024, 2017-Ohio-7122, ¶ 23-25.

### A "Statement of Understanding" Pursuant to R.C. 2151.353(A)(3)

{¶ 25} In her second assignment of error, Mother argues that the trial court erred in granting Father's motion for legal custody because he failed to file the "statement of understanding," required by R.C. 2151.353(A)(3). The statute provides,

(A) If a child is adjudicated [a] * * * dependent child, the court may make any of the following orders of disposition: * * *

(3) Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings. A person identified in a complaint or motion filed by a party to the proceedings as a proposed legal custodian shall be awarded legal custody of the child *only if* the person identified signs a *statement of understanding for legal custody* that contains at least the following provisions:

(a) That it is the *intent of the person* to become the legal custodian of the child and the person is able to assume legal responsibility for the care and supervision of the child;

12.

(b) That *the person understands* that legal custody of the child in question is intended to be permanent in nature and that the person will be responsible as the custodian for the child until the child reaches the age of majority. Responsibility as custodian for the child shall continue beyond the age of majority if, at the time the child reaches the age of majority, the child is pursuing a diploma granted by the board of education or other governing authority, successful completion of the curriculum of any high school, successful completion of an individualized education program developed for the student by any high school, or an age and schooling certificate. Responsibility beyond the age of majority shall terminate when the child ceases to continuously pursue such an education, completes such an education, or is excused from such an education under standards adopted by the state board of education, whichever occurs first.

(c) That the parents of the child have *residual parental rights*, privileges, and responsibilities, including, but not limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support;

(d) That the person understands that *the person must be present in court for the dispositional hearing* in order to affirm the person's intention to become legal custodian, to affirm that the person understands the effect

of the custodianship before the court, and to answer any questions that the court or any parties to the case may have. (Emphasis added.)

**{¶ 26}** Because Mother did not object at trial to the absence of a statement of understanding, she has waived all but plain error. *In re J.R.P.*, 7th Dist. Mahoning No. 17MA0169, 2018-Ohio-3938, ¶ 62-63. Moreover, the "failure to file a statement of understanding pursuant to R.C. 2151.353(A)(3) is not plain error when the party seeking legal custody has provided testimony at a hearing reflecting [his] intention to provide a home for the children, and the testimony further demonstrates an understanding of, and commitment to, being the children's legal custodian." *Id.* at ¶ 64, citing *D.T. v. Turner*, 7th Dist. Jefferson No. 14JE29, 2015-Ohio-2333, ¶ 29; *see also In re W.A.*, 5th Dist. Muskingum No. CT2013-0002, 2013-Ohio-3444, ¶ 15-16; *In re A.V.O.*, 9th Dist. Lorain Nos. 11CA010115, 11CA010116, 11CA010117, 11CA010118, 2012-Ohio-4092, ¶ 8-10.

**{¶ 27}** Father met those requirements in this case: Father appeared at the hearing and testified at length regarding his desire to assume full responsibility for E.Z.-S.'s upbringing, including his commitment to caring for the child's immediate and long term physical, emotional, and educational needs. He also testified that he would respect the Mother's parental rights. Consequently, there was no plain error in this case due to Father's failure to file a statement of understanding. Mother's second assignment of error is without merit.

14.

{¶ 28} Finally, in her third assignment of error, Mother argues that the trial court's decision to award legal custody to Father was against the "manifest weight of the evidence."

{¶ 29} A trial court determines an award of legal custody based upon proof by a preponderance of the evidence. *In re Nice*, 141 Ohio App.3d 445, 455, 751 N.E.2d 552 (7th Dist.2001). Because custody determinations "are some of the most difficult and agonizing decisions a trial judge must make," a trial judge must have broad discretion in considering all of the evidence. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). Therefore, an award of legal custody will not be reversed on appeal absent an abuse of discretion. *Id.; see also In re E.H.*, 6th Dist. Ottawa No. OT-15-044, 2016-Ohio-8170. To constitute an abuse of discretion, the ruling must be unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 30} An award of legal custody is authorized by statute where a child, as here, has been adjudicated neglected, dependent, or abused. R.C. 2151.353(A)(3). A determination of a child's best interest remains the primary standard to be applied in custody cases. *In re Pryor*, 86 Ohio App.3d 327, 332, 620 N.E.2d 973 (4th Dist.1993). "[C]ourts have looked to the best interest factors of R.C. 2151.414(D), R.C. 3109.04(F)(1) [Regarding Shared Parenting], a combination of the two, or general notions of what should be considered regarding the best interests of the [child]." (Quotation omitted.) *In re E.H.* at ¶ 16.

15.

**{¶ 31}** Here, Mother makes three arguments in support of her claim that the award of legal custody to Father is not in E.Z.-S.'s best interest. The first involves the following comment by the trial court at the conclusion of the hearing:

> I wish [E.Z.-S.] wasn't having trouble at school. For a first grader to go through the embarrassment and maybe he was looking for attention, and that even causes me greater concern if * * * that's why he was soiling his pants at school, was to get attention. And that even causes me more trouble than if it was an accident.

**{¶ 32}** Mother complains that, despite a lack of evidence "as to why the Minor Child was having these issues," the trial court "presumed the behaviors * * * would be better solved by a move away from [Mother]." While we agree with Mother that "mental or cognitive disorders," could not be ruled out as potential causes, we disagree that the trial court blamed Mother for E.Z.-S.'s behaviors. Instead, we regard the court's comment as nothing more than an expression of concern for the child's well-being. We would add that the court, in making that comment, was reacting to Mother's opinion—that E.Z.-S. was soiling himself because he "likes attention." We see no abuse of discretion by the trial court's comment.

**{¶ 33}** Second, Mother argues that she was "complaint [sic] with case plan services." In making custody determinations, the trial court's principal concern is the child's best interest. Therefore, "[w]hile completing her case plan may be in mother's best interest, this is not a factor in determining what is in the children's best interest."

16.

*In re. D.T.*, 8th Dist. Cuyahoga Nos. 100970 and 100971, 2014-Ohio-4818, ¶ 23 (The successful completion of a case plan, "is not dispositive on the issue of reunification."). Moreover, the record does not support Mother's claim that she complied with her case plan. Mother tested "positive" for drugs four different times after FCDJFS became involved in this case (between February and June 2018). In addition, as for her drug treatment, Mother "missed four [of six] sessions" at the first outpatient program, then had a "lapse of service for a month or so," and then, once enrolled in a second outpatient program, she "had multiple no shows." For these reasons, we find that Mother's claim, that she complied with case plan services, is not supported by the record.

{¶ 34} Third, Mother claims that, after the complaint was filed, E.Z.-S. "remained [under Mother's] protective supervision * * * [which demonstrates that] FCDJFS did not believe any risk to [E.Z.-S.] existed by him staying in the care and control of [Mother]." Again, as a factual matter, the record does not support Mother's claim. In the days after Mother's overdose, FCDJFS filed for protective supervision of E.Z.-S., and Mother agreed to an "in-home" safety plan whereby her brother, who traveled from Texas, assumed care for E.Z.-S. Days later, Mother agreed to an "out-of-home safety plan" whereby E.Z.-S. went to stay with a neighbor.

{¶ 35} "The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. * * *. In this regard, the reviewing court in such proceedings should be guided by

17.

the presumption that the trial court's findings were indeed correct." (Citations omitted.) *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).

The record contains ample evidence of Father's desire to obtain legal custody of E.Z.-S. and his commitment to creating an atmosphere that will allow E.Z.-S. to thrive there. Based on all of the evidence, the trial court determined that it was in E.Z.-S.'s best interest to be placed in the legal custody of his father. That determination is not arbitrary, unconscionable, or unreasonable. Accordingly, Mother's third assignment of error is found not well-taken.

{¶ 36} The judgment of the Fulton County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the court costs of this appeal pursuant to App. R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____
                                                   JUDGE
Thomas J. Osowik, J.

Christine E. Mayle, P.J. _____
CONCUR.                                                   JUDGE

_____
                                                   JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.